**HEADNOTE:** *Eric Roes v. State of Maryland*, No. 147, September Term 2017

**CRIMINAL LAW – SUFFICIENCY – NATURAL RESOURCES § 8-725.1 – ABANDONING A VESSEL –** Appellant was charged with abandoning two houseboats in the Choptank River. Appellant disputed that one of the two houseboats was "unattended," as provided in Natural Resources § 8-721. After considering the legislative history, the Court held that there was sufficient evidence for the jury to find that the boat, which was resting in the mud in a state of disrepair and deterioration, met the statutory definition and was abandoned.

**CRIMINAL LAW – SUFFICIENCY – CRIMINAL LAW § 10-110 – LITTERING –** Appellant challenged his two convictions for littering in an amount in excess of 500 pounds, in connection with two houseboats found abandoned in the Choptank River. Although boats are not listed in the criminal statute, the Court, after considering the legislative history and standard dictionary definitions, held that the houseboats constituted litter and upheld the jury's verdict.

**CRIMINAL LAW – MERGER – RULE OF LENITY – ABANDONING A VESSEL AND LITTERING –** Appellant's sentences for abandoning a vessel under Natural Resources § 8-725.1, merge into his sentences for littering in an amount in excess of 500 pounds under Criminal Law § 10-110, pursuant to the rule of lenity.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 147

September Term, 2017

_____

ERIC ROES

v.

STATE OF MARYLAND

_____

Meredith,
Arthur,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, James R., J.
_____

Filed:  April 4, 2018

* Judge Christopher B. Kehoe did not participate
in the Court's decision to designate this opinion
for publication pursuant to Md. Rule 8-605.1.

A jury in the Circuit Court for Caroline County convicted Appellant, Eric Roes, of two counts of abandoning a vessel, in this case, two houseboats, and two counts of littering in an amount exceeding 500 pounds. Appellant was sentenced to concurrent sentences of six months on all counts, all suspended, with two years of supervised probation. Appellant timely appealed and presents the following questions for our review:

> 1. Was the evidence sufficient to convict Appellant of abandoning a vessel?
>
> 2. Was the evidence sufficient to convict Appellant of littering in an amount exceeding 500 pounds?
>
> 3. Was it proper to impose separate sentences for abandoning a vessel and littering?

For the following reasons, we shall vacate appellant's sentences for abandoning a vessel, but otherwise affirm.

## BACKGROUND

In late 2015 and early 2016, Corporal Stephen Hunter, of the Department of Natural Resources Police, investigated numerous complaints concerning two sunken houseboats in the Choptank River near 11672 Greensboro Road, in Greensboro, Caroline County, Maryland.[1] Corporal Hunter phoned appellant, and asked him whether he owned the boats in question. Although appellant admitted that he owned the boat that was tied to his pier, and registered in his name, he denied that he owned the second boat, named the "Laughing Loon," that was tied to a nearby tree upriver from appellant's pier.

---

[1] The Choptank River is a public body of water in the State of Maryland. Corporal Hunter testified that both houseboats were approximately 45 feet in length and weighed over 500 pounds.

Asked at trial about the condition of the Laughing Loon, Corporal Hunter testified that it was "in a state of disrepair um, if you walk down and look at the boat, when the tide's up it's half submerged. You can look down the sides um, the boats are starting to buckle out and rot and decay." Further, "when the water is out it sits in the mud, and when the water's up it's half submerged, still sitting on bottom, like it doesn't float at all." Testifying from a photograph of the vessel, Corporal Hunter continued:

> [S]o it's just sitting in the mud, but, and if you look around it's, if you look on the inside it's half full of mud and leaves and debris. It actually appeared to me likes [sic] it's sinking down into the mud of the river. You could observe when the tide's out there's you know a rusted motor block and the stern of the boat. And just in general like I stated on the sides, I mean the actual hull itself is buckled and starting to come apart.

Corporal Hunter further testified that appellant told him that an unidentified individual placed the Laughing Loon at its location. Appellant stated that this boat "hadn't really bothered him," therefore, he never reported it as abandoned. Corporal Hunter confirmed that the Department had received numerous complaints about the Laughing Loon. Corporal Hunter was unable to find registration information, or any other indicia of ownership, for the Laughing Loon.

As for the second boat tied to appellant's pier, Corporal Hunter testified that it was unnamed but appeared to be a Seagoing brand houseboat (Seagoing boat). A photograph of the boat, depicting its condition, was admitted into evidence at trial. Some time in February 2016, Corporal Hunter told appellant that he had fourteen (14) days to repair the Seagoing boat attached to his pier to get it into a "floating condition." Appellant agreed to

2

comply with respect to that boat, but did not make any agreement with respect to the Laughing Loon.

After expiration of the fourteen days, Corporal Hunter visited appellant in March 2016. Corporal Hunter testified:

> Um, the boat tied to Mr. Roes['s] pier the physical condition of the boat didn't seem to have changed, it was buoyant at the time um, through the hatches you could still see there was some water down in the bilge of the haul [sic], but I physical tested the boat at the stern and the bow and it was floating. It was buoyant.

Corporal Hunter clarified, with respect to the Seagoing boat, that "I would call it buoyant but just the overall condition, you know going into the future, I wouldn't be surprised if it ended up sunk again." Asked to explain, the officer continued:

> Um, based upon the prior times I observed the vessel, and the overall condition, you could see, it seems especially when I saw it even when it was floating there's still water in the haul [sic], any rainwater you get or any tide water that got in would just keep collecting and cause the boat to sink.

On or about September 9, 2016, Corporal Hunter took more photographs of both vessels. As to the condition of both, he testified:

> The condition, I believe I went down when the water was higher, the boat at the pier was full of water and sunk: And the Laughing Loon that vessel was still in the same, or worsening condition, as prior occasions to, that I saw it.

He further testified that the Laughing Loon remained "sitting in the mud, still sitting on bottom" and was "buckled out where you can show where the condition of the haul [sic] itself is buckled and starting to rot apart." Further, "parts of the boat have started to deteriorate and [were] falling off the sides," and it was possible to see "the scum line, or when the ah, the tide comes up." He also observed "mud and leaves [and] other stuff, you

3

know sticks and twigs, and anything else you find in the river down inside the boat." As recently as December 2016, just a few months before trial, Corporal Hunter confirmed that the Laughing Loon was still in the water in a state of disrepair.

With respect to the Seagoing boat tied to appellant's pier, Corporal Hunter testified that, on or around September 9, 2016, at high tide, the boat was not "floating." A photograph showed that "water is over the bow. And um, the overall condition is it's sitting on bottom." On cross-examination, Corporal Hunter agreed that this houseboat did not appear to have an engine.

Officer Robert Karge, also with the Natural Resources police, testified that he also investigated this case and agreed that, from March to December 2016, both vessels in question were in a state of disrepair, meaning, "in a condition to where it's not going to be operable." On December 21, 2016, the railing for the Laughing Loon was falling off, and "water was seeping out of the interior with a lot of leaves and debris throughout the bottom," the scum line was high on the boat, and "pieces were obviously missing off the back, you can barely see an engine compartment from the back." And, the Seagoing boat, tied to the pier, was "full of water, and was inline with the ah . . . the front of the vessel was inline with the waterline. Sitting on bottom." The two boats were located approximately 100 yards apart. Asked to further explain his observations, Officer Karge testified as follows:

> A: Both vessels, the water line, the Laughing Loon has remained on the bottom the entire time that we've seen it and observed it um, over my, last, more then [sic] a year. The waterline continuously rises and falls with the tide, the sides of the vessel continually bow out further and there's different pieces missing every time I observe it. The vessel tied to the pier it

was observed to have, it had a large crack um, on the low tide we couldn't see it during the high tide because it was full of water. But, during low tide it was visible and sitting on bottom as having a large gapping [sic] whole [sic] in the front um, and it has a scuz line above the actual hull itself showing where the water, you know over a period of time, extended period of time has . . . has tarnished the paint.

Q: What . . . sorry to interrupt, what is a scuz line?

A: So, you can observe it on pilings things of that nature, so at high tide the tide levels ah, stay kind of constant and for a period of time all the water, bacteria, and algae starting adhering to that specific object based on the high tide. When the tide mark line goes down, then it's visible and it's off colored and it wouldn't be, you know the same appearance, on a white vessel you can see these due to discoloration from the white. It's going to be sometimes brown, sometimes red, sometimes green, it just depends.

Officer Karge then identified a photograph of the Seagoing boat. He testified that this photograph, taken around the summer of 2016, depicted the following:

So, in this picture, the photograph was taken from a vessel, a patrol vessel facing towards the property. You can see where the front of the vessel is and it has a door on it. The waterline is above the actual deck itself, the lines are taunt [sic], or were loose at that time. You can see the off coloring just above the waterline that I was talking about, as well as on the pilings. You can see it's much darker towards the bottom where the tide line usually sits, which is indicative of a vessel that's been in this state or sitting in that condition with the tides rising and falling over a period of time.

Officer Karge agreed that, at one point in March 2016, the Seagoing boat was floating, but had not been observed afloat since then. He further testified that both boats had deteriorated and, at no point between March and December 2016, did they improve.

On cross-examination, Officer Karge agreed that the fact that a boat was sunk was only one factor in determining whether the boat was "abandoned." On redirect, Officer Karge was then asked to explain what factors went into the determination that these boats were abandoned:

5

Basically from the definition um, because it was found um, unattended in and upon the waters of the State, based on the condition, found in a condition of disrepair to constitute a hazard or obstruction to the use of the waters of the State or present a potential health or environmental hazard based on the investigations done into numerous abandoned boats in the past, um, judging by the condition of these with the one up against the pier which the roof had blown off and was floating somewhere going down under water possible other pieces floating off of it, the Laughing Loon in a continuing state of disrepair with parts missing not knowing where those are, could possibly be a navigational channel but also in a state of disrepair of pieces missing, it's bowed out to the side, I'd say inoperable. Um, that would classify as [an] abandoned boat in the State of Maryland.

Peter Tallie, appellant's neighbor, testified that, to the best of his knowledge, the houseboat tied to a tree, *i.e.*, the Laughing Loon, was on appellant's property. Tallie testified that he used to swim in the Choptank River near appellant's property and noticed the condition of the boats. On one occasion, Tallie asked about the condition of the Seagoing boat tied to appellant's pier, and appellant replied that he just needed to pump it out and that he was working on it. Tallie also testified that, in the approximately fifteen years that he lived near appellant, appellant never denied owning the two houseboats in question.

Another neighbor, Christian Curtis, testified that he first bought his property near appellant in April 2005. He was aware that appellant had a pier and owned two houseboats and a jet ski. Curtis then testified:

Ah, there were, one houseboat was at the dock. The other one was about a hundred yards maybe or so, up river it was lashed to a tree; The houseboat that was lashed to a tree used to be at the dock it was towed up there, we saw Mr. Roes bringing it up river, I say we, my wife and I. Um, and it was called, we remember the name was called the Laughing Loon we remembered it was from Washington, D.C, which my wife and I commented about because we are originally from that area. And it was put at the dock and then that Laughing Loon is no longer at the dock, it's now up river, like

6

I said it's lashed to tree. And there's a second houseboat it doesn't have a name on it, it's now at the dock. This occurred around Summer 2006. I could well, I got . . . yeah that sounds right.

Curtis testified that, when he originally saw the Laughing Loon, it was tied to appellant's pier. He saw appellant "working on it at one point, I think they were trying to get the engines running because I saw black smoke belching out of the back." After this, Curtis saw appellant tow the Laughing Loon and tie it to a tree. The Seagoing boat arrived soon thereafter, in approximately 2006. Curtis also saw appellant working on this second houseboat over time.

Christopher Voorhes, another neighbor, testified that, at one point, both houseboats were afloat, but neither had been afloat for several years. Voorhes confirmed that he had seen appellant on the Seagoing boat. He also testified that the Laughing Loon was towed to its present resting place in the mid-2000's.

Appellant testified on his own behalf and admitted that the pier and the Seagoing boat tied to it were on his property. Although he did not live at this location, appellant contended that he was "constantly working" on that boat, from March to December 2016. This included lifting it out of the water, fixing the keel, and pumping it out. He stated that he "had it floating pretty good for awhile." He admitted that, at a later point in time, the boat was sitting in the mud, "[b]ut it's in a good spot where, the mud kind of holds it there, until we swap the battery out and pumped it back out again." He also testified that "at this point we try to keep a good battery or two on it. And we're trying to hook a solar charger on the top."

7

Appellant maintained that he did not own the Laughing Loon and did not know who did. When asked whether the tree that the Laughing Loon was tied to was located on his property, appellant did not deny that it was, but replied, "it's very hard to say . . . ." Appellant then testified that, after he learned that the Department of Natural Resources would not remove the Laughing Loon, his wife got an estimate and they learned that it would cost between $6,000 and $10,000 to remove it.

Appellant also testified that the Seagoing boat had been tied to his pier since approximately 2000, and the Laughing Loon appeared in around 2005 or 2006, after he built his pier. He agreed that, when this other person brought the Laughing Loon to the area, he may have docked it temporarily at his pier and he may have helped him work on it.

On cross-examination, appellant was asked about repairing the Seagoing boat:

> Q. How much would it cost to fix the boat that is currently tied to your pier that you admit to owning?

> A. Well, not much, I mean the big cost is getting it down in the river, having it pulled out, and put up on blocks, about a Thousand Dollars ($1,000) for that and maybe to really do a good job on the hull, another Thousand Dollars ($1,000). And there's things I'd like to do to it as well put some new windows in it, a new door, it needs a paint job really bad. And tighten up the roof so it doesn't have any leaks.

> Q. But you haven't done that for all of the years that it's been there?

> A. No, I've done a lot that boat is, you can ask my wife, keeps me busy and I don't get much, I spend way too much time working on that boat. The last couple years we just had another baby and it's taking away from it a little bit, and it went down. I just heard about it when the DNR police told me it was sunk I ran down there within fourteen days I had it floating again. So, they, that was their testimony if I . . .

8

Q. Yet, both of those boats were sinking between March of 2016 and December 2016?

A. That was after we got, we were allowed fourteen days to get it floating. And they said everything was fine and all the charges were dropped. I thought that was the end of it. And then shortly thereafter, we had it floating it, the crack got further down, and we had to go back in a few times and fix that crack. And I'm sure it's going to get done ever better, so we don't have future problems. We intend on pulling it out, my boat out, I've already had that lined up.

Appellant denied that, from March to December 2016, the Seagoing boat was underwater, testifying that he thought it was afloat most of the time, and that, if not, he pumped it out. But, he agreed that "I haven't really had a chance to do the repairs a hundred percent. So, hopefully I can get it out of the water, I'll get that repaired and I won't have these problems anymore. That's my goal." Appellant also stated that he knew someone who owned a marina two miles downriver and that this person had a crane that could put the boat on a trailer. When asked by the prosecutor why he had not pursued that before, appellant replied, "[w]ell we really never asked him before."

We shall include additional detail in the discussion that follows.

DISCUSSION

I.

Appellant first contends that the evidence was insufficient to convict him of abandoning the Seagoing boat that was tied to his pier on the grounds that it was not "unattended" as defined by Section 8-721 of the Natural Resources Article. The State

9

disagrees, asserting that the jury could properly decide that this houseboat had deteriorated to the point where it was abandoned under the applicable statutes.[2]

In sufficiency cases, we ask "'whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Grimm v. State*, 447 Md. 482, 494-95 (2016) (quoting *Cox v. State*, 421 Md. 630, 656-57 (2011)); *accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When making this determination, the appellate court is not required to determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *State v. Manion*, 442 Md. 419, 431 (2015) (emphasis in original) (quoting *Dawson v. State*, 329 Md. 275, 281 (1993)). Rather, it is the trier of fact's task to weigh the evidence, and the appellate court will not second guess the determination of the trier of fact "where there are competing rational inferences available." *Manion*, 442 Md. at 431 (quoting *Smith v. State*, 415 Md. 174, 183 (2015)).

Generally, our standard of review has two basic components: (1) the "essential elements" of the crime; and, (2) whether the State has met its burden of production. Considering the "essential elements" on appeal involves an interpretation of Maryland statutory and case law. In such instances, we "must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Rodriguez v. State*,

---

[2] Appellant does not challenge the sufficiency of the evidence for abandoning a vessel with respect to the Laughing Loon. He also does not challenge whether the Seagoing boat posed a health or environmental hazard.

221 Md. App. 26, 35 (citations omitted), *cert. denied*, 442 Md. 517 (2015). With respect to the burden of production, this Court has explained:

> In a criminal case, no issue is more important than whether the State has satisfied its burden of production. The concern is with production, as a matter of law, and not with persuasion, as a matter of fact. The appellate assessment of the burden of production is made by measuring the evidence that has been admitted into the trial objectively and then determining whether that body of evidence is legally sufficient to permit a verdict of guilty. In a jury trial, a motion for a judgment of acquittal at the end of the entire case initiates the examination of the satisfaction of the burden of production. If that burden of production is not satisfied, the trial judge is wrong, as a matter of law, for denying the motion and for allowing the case even to go to the jury.

*Chisum v. State*, 227 Md. App. 118, 130 (2016); *see also Burns v. State*, 149 Md. App. 526, 547 (2003) ("Our concern is with whether [the trial judge] was correct, as a matter of law, in allowing the case to go to the jury. What the jury then did with the evidence is, on this issue, beyond our purview").

Section 8-725.1(a) of the Natural Resources Article provides that "A person may not abandon, as defined in § 8-721 of this subtitle, any vessel upon any waters of the State." Md. Code (1973, 2012 Repl. Vol) § 8-725.1(a) of the Natural Resources ("Nat. Res.") Article. In turn, and pertinent to our discussion, Nat. Res. § 8-721 provides:

> (a) In this section, "abandoned or sunken vessel" means any vessel that:
>
>     * * *
>
> (5)(i) Has been found adrift or unattended in or upon the waters of the State, and is found in a condition of disrepair as to constitute a hazard or obstruction to the use of the waters of the State or presents a potential health or environmental hazard; . . .

Nat. Res. § 8-721.

11

Appellant's contention is that the Seagoing boat was not "unattended" under the statute. This argument was presented to the trial court at the end of the State's case-in-chief:

> Number five, has been found adrift or unattended or in and upon the waters of the State. A vessel, it's clearly not adrift. The testimony is that this is tied to the dock. Unattended does not apply to a boat that is tied to a dock, that is ah, that is registered and that has had people working on it. That's not unattended, it's not adrift. It's also not a hazard or an obstruction to the use of the waters because it's at a dock. A dock is not navigable water. It is not public navigable water. There's been no testimony as to health or environmental hazard. For those reasons I would ask you to grant a motion for judgment of acquittal as to the boat at the pier, as Mr. Roes cannot abandon his own boat on his own property.

The State responded, in part:

> The Defendant has clearly, which has been seen by, heard in the testimony, he's been the only person um, he has been in control of these boats. Both of which have been at his pier and they've moved, and they both are in a state of disrepair. They are both not fixed.

Further:

> [W]e have testimony from the Natural Resource Officer that the boat that ended up at the Defendant's pier, the [S]eagoing boat was deteriorated with pieces falling off it. And that constitutes a potential health hazard and that's where Statute 8-725.1 abandonment of the vessel. And Your Honor also the State would like to be heard just a little bit more briefly. Um, the boat was, after listening to the testimony it was clear that both boats were unattended between the dates that the State is charging with. Which is March 2016 to December 2016, there is no testimony that the Defendant worked on the boat from March 16th . . . March 2016 to December 2016.

At this point, defense counsel interrupted and the following ensued:

> [DEFENSE COUNSEL]: That's just false he stated, one of the witnesses stated to the contrary.
>
> THE COURT: One of the witnesses said I believe that he saw there were some work being done on the boat attached to the pier.

12

[PROSECUTOR]: But not during the dates that . . .

THE COURT: No, it wasn't during the, it was prior to March of 2016.

[PROSECUTOR]: And both . . . both boats have been sunk since . . . since March 2016 through December 2016. That's the date that the State's is talking about. The boats are clearly a hazard when you have two very experienced officers talking about the environmental hazard when there's pieces of the boat falling off. You have people kayaking in the river, swimming in the river and pieces of large houseboats falling off, such as the roof that was testified. Each witness has said that the tree was on the Defendant's property. And the State would rest with that.

Argument on the defense motion for judgment of acquittal concluded as follows:

[DEFENSE COUNSEL]: Um, pieces falling off of it, there was no testimony as to any kind of any environmental impact from pieces falling off of it. We don't have any expert telling us what happens if a piece of some certain material falls in the water, and what kind of environmental impact that might have. There was no testimony as to anyone possibly being of interest or any type of safety issue. This is all supposition and hypothetical. This whole case is suppositional and hypothetical. It's the boat was obviously not, the boat at the pier was obviously not unattended if it was floated it one point, it did not float itself. It was pumped out. It's not unattended; And Your Honor someone is allowed to leave their boat at their dock and not touch it. I have a boat in Annapolis right now, that I'm not touching, it's not abandoned. It's, I mean that's an asinine argument.

THE COURT: Well, if it was falling apart, if it was sunk, if it was sitting on the bottom of the river, you're saying that wouldn't be . . .

[DEFENSE COUNSEL]: It's tied to the dock and it's registered.

THE COURT: There's more to it then [sic] that.

[DEFENSE COUNSEL]: I don't think there is.

THE COURT: Well, I do. All right, I'm going to deny the motion at this time. Ah, you can, I have to explain, but you all know I have to look at the evidence in the light most favorable to the State when I rule on this motion. It may be renewed at the end of the case if the Defense wishes to do so.

13

The canons of statutory construction are well settled and begin with the "cardinal rule" that requires us to "ascertain and effectuate the intent of the Legislature." *Jamison v. State*, 450 Md. 387, 396 n.9 (2016) (citation and quotation omitted). To that end, "we first examine the plain language of the statute, and if the plain language of the statute is unambiguous and consistent with the statute's apparent purpose, we give effect to the statute as it is written." *Id.*; *see also Hurst v. State*, 400 Md. 397, 417 (2007) ("Unambiguous language will be given its usual, ordinary meaning unless doing so creates an absurd result") (citing *MVA v. Shepard*, 399 Md. 241, 254 (2007)).

Moreover, "[w]e begin by looking to the plain language of the provision with a goal of 'discern[ing] the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules.'" *Fuller v. Republican Cent. Comm. of Carroll Cnty.*, 444 Md. 613, 629 (2015) (quoting *Davis v. Slater*, 383 Md. 599, 605 (2004)). Further, "we do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580-81 (2014) (quoting *Lockshin v. Semsker*, 412 Md. 257, 275-76 (2010)).

When Nat. Res. § 8-725.1 was originally added in 1977, the statute prohibited the following: "(a) a person may not wilfully abandon or wilfully cast adrift any vessel upon any waters of the State." 1977 Md. Laws, ch. 511, § 1 (H.B. 1041). In 1985, "wilfully" was deleted. As recorded in the Laws of the State of Maryland, the amended statute read

14

as follows: "(a) A person may not [wilfully] abandon [or wilfully cast adrift], AS DEFINED IN § 8-721, any vessel upon any waters of the State." 1985 Md. Laws, ch. 670, § 1 (H.B. 1004). The purpose of removing the wilful element was stated as "changing the misdemeanor offense of abandonment of a vessel from a crime of specific or willful intent to a crime of general intent." *Id*. According to the Maryland Laws, Section 8-721 was added and provided, in pertinent part:

> (a) In this section "abandoned vessel" means any vessel:

> (3) That has been found adrift or unattended in or upon the waters of the State, ~~OR~~ AND is found in such disrepair as to constitute a hazard or obstruction to the use of the waters of the State or presents a potential health or environmental hazard."

1985 Md. Laws, ch. 670, § 1 (H.B. 1004).

The purpose of the law was to authorize the Department of Natural Resources (the "Department") "to seize and remove 'abandoned vessels' and to delegate this authority to any county." Fiscal Note, House Bill 1004 (Department of Fiscal Services 1985). Notably, in 1985, the Department estimated that it removed an average of 51 boats per year at a total cost of $58,000. *Id*. According to the Committee Report from the Senate Judicial Proceedings Committee:

> Presently, the Department of Natural Resources has found it difficult to remove abandoned vessels and enforce specific provisions of the State Boat Act which impose penalties on owners who abandon vessels in State waters. The chief reason is that existing legislation contains language which uses the term "willful". It is difficult to prove "willfulness" since proof of "willfulness" must include an admission or a witness to the act.

Summary of Committee Report, Senate Judicial Proceedings Committee, House Bill 1004 (State Boat Act – Abandoned Vessel) (1985).

15

The Department explained its support for expansion of the law because "existing legislation contains language that makes it difficult to prove intent (willfully), time restrictive in length of time in abandonment (6 months), and difficulty in proving ownership." Bill Report, Department of Natural Resources, H.B. 1004 – 3rd (March 28, 1985). And:

> The Department is of the opinion that there will be several positive impacts as a result of this legislation. (See attachment form Natural Resources Police). HB 1004 will correct the described enforcement problems and will act as a deterrent in the indiscriminate abandonment of vessels on the waters of the State.
>
> It will also define specific terms and establish procedures whereby the Department will have the authority to remove abandoned vessels from State waters in a more timely and efficient manner. In addition, it will allow the Department to reclaim removal costs, estimated to be $25,000.00 per year, from boat owners whose vessels are presently being removed at State expense.

Bill Report, Department of Natural Resources, H.B. 1004 – 3rd (March 28, 1985); *see* Attachment, Natural Resources Police, Department of Natural Resources (Ref: HB 1004) ("From the standpoint of the Natural Resources Police one of the major problems in enforcing the abandoned boat law has been the difficulty in proving liability. . . . Another equally serious problem has been the difficulty in proving ownership"); *see also* Letter from Mick Blackistone, Executive Director of the Marine Trades Association of Maryland, House Judiciary Committee, H.B. 1004 (February 27, 1985) ("Abandoned vessels continually cause environmental and navigational problems on our waterways").

We recognize that some of the materials described above originated from advocates, not from members of the General Assembly. Nevertheless, such information provides

16

context for the General Assembly's action and may be considered for that limited purpose. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514 (1987). Based on our consideration of the text itself, our starting point, the legislative history, including the removal of the specific intent limitation, and the circumstances providing a context for the General Assembly's action, we discern the intent of the abandoned vessel statute to be broader than suggested by appellant. Nevertheless, we must determine what is meant by "unattended." "Unattended" is not defined in the statute. "In determining the ordinary meaning of words, we have found it helpful to consult their dictionary definitions." *In re Cody H*., 452 Md. 169, 184 (2017). According to the Oxford English Dictionary, the definition of "unattended" is "1. Not attended or waited upon; unaccompanied. . . . 2. Not attended or accompanied *by* or *with* some thing, circumstance, etc. . . . 3. Not attended *to*." XVIII, The Oxford English Dictionary 870 (2d ed. 1989) ("OED"). "Attended" is further defined as "[w]aited upon, accompanied, frequented" and "2. To turn the mind to, give consideration or pay heed to, regard, consider . . . 4. To turn the energies to, give practical heed to, apply oneself to, look after . . . 5. To direct one's care to; to take care or charge of, look after, TEND, guard." I OED 765-66 (2d ed. 1989).

Here, the evidence established that appellant owned the Seagoing boat that was tied to his pier. Photographs of the boat were admitted into evidence and available for the jury's consideration. During most of the time in question, this boat was resting in the mud, in a state of disrepair and deterioration, and, because it was missing an engine, not operable. There was evidence that there was a large crack in the hull, causing water to enter the vessel. There was also a visible "scuz" line, suggesting that the boat had not been moved

17

for some extended period of time.  We are persuaded that this evidence was sufficient to meet the State's burden of production.

Furthermore, although appellant testified that the boat was not unattended because he was constantly working on it, ultimately, that was an issue of credibility that was best left to the factfinder.  As we have repeatedly stated, "[i]t is 'the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses.'  In so doing, the jury 'can accept all, some, or none of the testimony of a particular witness.'" *Correll v. State*, 215 Md. App. 483, 501-02 (2013) (internal citations omitted), *cert. denied*, 437 Md. 638 (2014). We hold that the evidence was sufficient to sustain appellant's conviction for abandoning a vessel.

## II.

Appellant next asserts that the evidence was insufficient to sustain his two littering convictions, one for each of the two houseboats, on the grounds that boats do not meet the statutory definition of "litter."  Appellant also contends that the houseboats were never "discarded."  The State responds that "[t]wo disintegrating boats comfortably fit" the definition of litter, therefore, the evidence was sufficient to sustain these two convictions. We agree.

Section 10-110 of the Criminal Law Article provides, in pertinent part:

> (c) A person may not:

> \* \* \*

> (2) dispose or cause or allow the disposal of litter on public or private property unless:

18

> (i) the property is designated by the State, a unit of the State, or a political subdivision of the State for the disposal of litter and the person is authorized by the proper public authority to use the property; or
>
> (ii) the litter is placed into a litter receptacle or container installed on the property.

Md. Code Ann. (2002, 2012 Repl. Vol., 2017 Supp.) § 10-110 of the Criminal Law Article

("Crim. Law").[3]

Discussion about this issue occurred at the end of the State's case-in-chief, when appellant argued as follows:

> Your Honor the litter statute is clear. A person may not dispose or cause or allow the disposal of litter on public or private property unless and the exceptions do not apply here. Um, obviously this is, I'm not disputing the property aspect, it's either public or private, whatever designation you want to give it. But litter is defined as rubbish, waste matter, refuse, garbage, trash, debris, dead animals, or other discarded materials. A boat that's tied to a dock and that has been worked on is not a discarded material. It clearly falls outside the scope of the statute.

The State responded to this specific argument as follows:

> [A] boat that is sunk in the water is a discarded material. The State isn't saying that every single boat in the water is a discarded material. But we are arguing that a boat that is by every witnesses [sic] testimony deteriorated is a boat that is discarded of.

Although laws against litter existed in the Maryland statutes at least as early as 1959, *see* 1959 Md. Laws, ch. 630 (H.B. 406), the present form of the Litter Control Law was

---

[3] "Public or private property" includes "a body of water or watercourse or the shores or beaches of a body of water or watercourse[.]" Crim. Law § 10-110 (a) (4) (ii). There is no dispute that the houseboats were in the Choptank River, and that the Choptank is a recognized body of water in the State of Maryland.

enacted in 1971 as Section 468 of former Article 27. *See* 1971 Md. Laws, ch. 106 (HB 28); *see also* Maryland Legislative Council Report to the General Assembly of 1971, Proposed bills, Special Committee reports, p. 162 (1971). Section 468(c)(1) defined "litter" as "all rubbish, waste material, refuse, garbage, trash, debris, dead animals or other discarded materials of every kind and description." Section 468(d)(1) provided that "[i]t shall be unlawful for any person or persons to dump, deposit, throw or leave, or to cause or permit the dumping, depositing, placing, throwing or leaving of litter on any public or private property in this State, or any waters in this State," except under certain circumstances not applicable here. And, Section 468(e) provided possible penalties of $250, imprisonment of 30 days, or both, or, and at the discretion of the court, remediation of the affected area.

In 1993, the Legislature added a new three-tiered penalty schedule that linked the penalty to the amount of litter dumped, as well as whether the dumping was commercial or non-commercial. *See* 1993 Md. Laws, ch. 474 (SB 772). As explained by the background from the Bill Analysis for Senate Bill 772:

> Although current law provides heavy penalties for companies that dump large amounts of hazardous or polluting materials on property or in water, no corresponding penalties exist for persons who dump large amounts of nonhazardous waste (e.g., automobile tires) or waste that is only suspected of being hazardous but cannot easily be tested (e.g., drums of oil and grease).
>
> Under current law, a violation of the Litter Control Law is a misdemeanor and carries a maximum penalty of $1,000 or imprisonment for not more than 30 days, or both, regardless of the amount of litter that is dumped or whether the litter was dumped for commercial or noncommercial purposes. Moreover, under current law, a court may waive the fine and imprisonment and instead order a violator to remove the litter that the violator has dumped. The bill also allows a court to order a violator to remove litter, but the court may issue the order only in addition to imposing a sentence of a fine or imprisonment.

20

The enhanced penalties that call for a maximum fine of $25,000 for a misdemeanor violation and a maximum fine of $100,000 for a felony violation are comparable to the penalties currently imposed on violators of the water pollution control and hazardous materials and hazardous substances statutes.

The elimination of the exception that allows property owners and others to use property as a private dumping ground is intended to bring the Litter Control Law into accordance with Title 9 of the Environment Article, which requires a person who seeks to operate a refuse disposal system to obtain a permit from the Department of the Environment.

Bill Analysis, Senate Bill 772, Senate Judicial Proceedings Committee (1993).

This expansion of the law received significant support from various entities, including, for instance, the Department of Environmental Resources for the Prince George's County Government. That Department asked the Senate Judicial Proceedings Committee to assist its continuing efforts at "enhancing environmental quality" and requiring "strong action against littering and illegal dumping." Letter from Eugene T. Lauer, Director, Department of Environmental Resources, Prince George's County Government, to the Honorable Walter M. Baker, Chairman, Senate Judicial Proceedings Committee (March 15, 1993). Director Lauer continued:

Ask anyone who has helped clean up a stream, pulled tires out of a river or collected trash from our streets and neighborhoods, and you cannot fail to understand the costs that illegal dumping and careless littering impose on our community pride, our natural environment, our quality of life, and our public services.

SB-772 amends the Litter Control Act to provide for penalties based on the extent of the violation. Those that cause serious harm to the environment should be subject to penalties in relation to that harm. This legislation does just that. . . .

*Id.*; *see also* Letter from Richard J. Logue, Mayor, City of Bowie, to the Honorable Walter Baker, Jr., Chairman of Senate Judicial Proceedings Committee (March 9, 1993) (supporting the imposition of "penalties in relation to the severity of the offense"); Letter and Testimony from Thomas Kusterer, Senior Environmental Planner, Montgomery County Government, to Honorable Joseph Vallario, Chairman, House Judiciary Committee (March 31, 1993) (offering support for SB 772, specifically the increased penalties "in light of the amount of illegally discarded waste" and observing that "Montgomery County received approximately 400 complaints resulting from illegal dumping of waste in 1992").

In addition, the Office of the Maryland Attorney General offered its support for the enhanced penalties based on volume by informing Chairman Vallario of the following:

> Since 1982, the [Environmental] Crimes Unit has received numerous complaints about unpermitted landfills and midnight dumpings. Two years ago an investigation involving this office revealed a notable increase in out-of-state generated debris being dumped in our northern and western counties. Most recently a District resident dumped almost 500 tires in Prince George's County. Although he was charged with littering, there is little chance that he will be extradited for this misdemeanor violation. There is an economic incentive for this illegal dumping as tipping fees continue to rise. We can only hope to counter this trend with equally strong sanctions against violators.

Letter from Elizabeth Beebe Volz, Supervising Attorney, Environmental Crimes Unit, Office of the Attorney General, to Honorable Joseph F. Vallario, Jr., Chairman, House Judiciary Committee (March 31, 1993).

Moreover, the Interstate Commission on the Potomac River Basin also voiced strong support for the enhanced penalties in a letter to Chairman Baker, observing:

> All levels of government and individual citizens are being asked to pay for more pollution control and land management function to improve water

quality, all of which is needed. But when the neighborhood stream and its banks are loaded with trash, or the boater has to be wary of floating debris, there can't be much incentive to make the big financial commitment. Another concern is that dumped material frequently contains toxics which adds another dimension to the problem.

Letter from Herbert M. Sachs, Executive Director, Interstate Commission on the Potomac River Basin, to Honorable Walter M. Baker, Chairman, Senate Judicial Proceedings Committee (March 12, 1993).

Executive Director Sachs also noted that restoration efforts on the Anacostia River, are regularly hampered "when every rainstorm washes a new load of truck tires, auto parts and litter onto previously cleaned shorelines and banks." *Id.* Not only does illegal dumping result in degraded aesthetic and environmental quality, the Director also indicated that "[r]ecreational boats sustain costly damage due to collision with floating trash and debris." *Id.*; *see* Anacostia Watershed, Interstate Commission on the Potomac River Basin, vol. IV, no. 3, p. 2 (Summer 1991) (noting the long time it takes for such items as plastic containers, bags, car parts and tires, wood pallets, shopping carts, and refrigerators to decay in local streams and rivers); *see also* Letter from John J. Neville, Chairman, Citizens Concerned for a Cleaner County, to the Honorable Walter M. Baker, Chairman, Senate Judicial Proceedings Committee (March 12, 1993) (supporting S.B. 772 and noting that current law was not effective because "[p]resently, violators face the same penalty whether they toss out a gum wrapper or dump 500 tires").

Again, after considering text, legislative history, and advocates' positions providing context, we conclude that by including enhanced penalties based on volume, the Legislature did not just intend to prohibit the dumping of "petty waste and refuse

23

commonly disposed of in trash receptacles," as appellant suggests. Appellant's argument appears to be that, since neither "boat" nor "vessel" are included in the definition of "litter," he cannot be guilty of violating Crim. Law § 10-110.

Again, we consider the commonly understood definitions of these terms. "Litter" is defined by statute as "all rubbish, waste matter, refuse, garbage, trash, debris, dead animals, or other discarded materials of every kind and description." Crim. Law § 10-110(a)(3). According to the Oxford English Dictionary, the verb "Litter" means: "4. Odds and ends, fragments and leavings lying about, rubbish; a state of confusion or untidiness; a disorderly accumulation of things lying about." VIII OED, p. 1038. "Rubbish" is defined as: "1. a. Waste or refuse material, in early use esp. such as results from the decay or repair of buildings, debris, litter, refuse; rejected and useless matter of any kind." XIV OED, p. 196. Next, "refuse" means: "2. a. Rejected or thrown aside as worthless or of little value; discarded, useless . . . B. 1. a. That which is cast aside as worthless; rubbish or worthless matter of any kind; the rejected or rubbishy part of anything." XIII OED, p. 494. "Garbage" can mean: "2. Refuse in general; filth." VI OED, p. 363. "Trash" can mean: "1. a. That which is broken, snapped, or lopped off anything in preparing it for use; broken or torn pieces, as twigs, splinters, 'cuttings from a hedge, small wood from a copse' . . . 3. a. Anything of little or no worth or value; worthless stuff; rubbish; dross. (Said of things material or immaterial.)" XVIII OED, p. 439. And, "debris" means: "1. The remains of anything broken down or destroyed; ruins, wreck." IV OED, p. 314.

Finally, the prohibited acts under Crim. Law § 10-110 include "disposal," a form of "dispose" which means: "8. b. To put or get (anything) off one's hands; to put away, stow

24

away, put into a settled state or position; to deal with (a thing) definitely; to get rid of; to get done with, settle, finish." IV OED, p. 820. Also included in the catch-all provision of "litter," the verb "discard" means: "2. To cast off, cast aside, reject, abandon, give up." IV OED, p. 728.

Given the common understanding of these words, we conclude that the State met its burden of production. The issue of whether appellant discarded the boats or otherwise disposed of them was best left to the fact-finder. Notwithstanding appellant's denials concerning the Laughing Loon, and his claims of ongoing work on the unnamed houseboat, there was evidence from appellant's neighbors and the Natural Resources police that supported a finding that the houseboats in question constituted "litter" under Criminal Law § 10-110.

III.

Finally, appellant contends that separate sentences for littering and abandoning a vessel are illegal under the rule of lenity and fundamental fairness. The State responds that appellant's fundamental fairness argument is unpreserved and his argument under the rule of lenity is without merit. We conclude that the sentences merge under the rule of lenity.

Generally:

The merger of convictions for purposes of sentencing derives from the protection against double jeopardy afforded by the Fifth Amendment of the federal Constitution and by Maryland common law. *Nicolas v. State*, 426 Md. 385, 400, 44 A.3d 396 (2012). Merger protects a convicted defendant from multiple punishments for the same offense. *Id.* Sentences for two convictions must be merged when: (1) the convictions are based on the same act or acts, and (2) under the required evidence test, the two offenses are deemed to be the same, or one offense is deemed to be the lesser included

25

offense of the other. *Id*. at 400-02, 44 A.3d 396; *State v. Lancaster*, 332 Md. 385, 391, 631 A.2d 453 (1993).

*Brooks v. State*, 439 Md. 698, 737 (2014).

We have already discussed the elements of these two offenses. The offenses do not merge under the required evidence test as neither is a lesser included offense of the other. Indeed, not only could a person litter items other than "vessels," but a person could abandon a vessel without that abandonment constituting the offense of littering.

That does not end our inquiry, however, because the rule of lenity, "applicable to statutory offenses only, provides that where there is no indication that the [General Assembly] intended multiple punishments for the same act, a court will not impose multiple punishments but will, for sentencing purposes, merge one offense into the other." *Garner v. State*, 442 Md. 226, 248 (2015) (citation omitted). Indeed, "[t]he rule of lenity is a common law doctrine that directs courts to construe ambiguous criminal statutes in favor of criminal defendants." *Alexis v. State*, 437 Md. 457, 484-85 (2014). Further, the rule "applies only where at least one of the two offenses subject to the merger analysis is a statutory offense." *Latray v. State*, 221 Md. App. 544, 555 (2015). This canon of statutory construction assumes that "it is reasonable to believe that the legislature that enacted a particular statute or statutes would express some intent as to multiple punishment." *Id*. at 556 (citation omitted). "If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated choice," but when there is uncertainty "as to what the Legislature intended, we . . . give the defendant the benefit of the doubt." *Id*. at 555 (citation omitted).

26

In this case, the amended charging document charged appellant, from March 4, 2016 through December 20, 2016, at 11672 Greensboro Road, Greensboro, Caroline County, Md., with: (1) "abandoning or casting adrift vessels to wit: Sea Going 45' house boat," in violation of Natural Resources § 8-725.1; (2) "abandoning or casting adrift vessels to wit: Laughing Loon house boat," in violation of Natural Resources § 8-725.1; (3) "unlawfully dispos[ing] of . . . said litter exceeding 500 lbs in weight/exceeding 216 cubic feet in volume/being for commercial purposes," in violation of Criminal Law § 10-110; and, (4) "unlawfully dispos[ing] of . . . said litter exceeding 500 lbs in weight/exceeding 216 cubic feet in volume/being for commercial purposes" against the Peace, Government, and Dignity of the State.

The penalty for abandoning a vessel includes:

(c)(1) Any person who violates any provision of this section is guilty of a misdemeanor. Upon conviction, the person is subject to a fine not exceeding $1,000 or imprisonment not exceeding 6 months, or both.

(2) Any person found guilty of a second or subsequent violation of any provision of this section is subject to a fine not exceeding $2,000 or imprisonment not exceeding 1 year, or both.

(3) Any person who violates any provision of this section is liable to the State for the cost of removal of the vessel.

(4) The provisions of this section do not apply to a vessel wrecked through an act of God or negligence of a third party.

Nat. Res. § 8-725.1.

The penalty provision for littering is as follows:

(f)(1) A person who violates this section is subject to the penalties provided in this subsection.

27

(2)(i) A person who disposes of litter in violation of this section in an amount not exceeding 100 pounds or 27 cubic feet and not for commercial gain is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 30 days or a fine not exceeding $1,500 or both.

(ii) A person who disposes of litter in violation of this section in an amount exceeding 100 pounds or 27 cubic feet, but not exceeding 500 pounds or 216 cubic feet, and not for commercial gain is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $12,500 or both.

(iii) A person who disposes of litter in violation of this section in an amount exceeding 500 pounds or 216 cubic feet or in any amount for commercial gain is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $30,000 or both.

(3) In addition to the penalties provided under paragraph (2) of this subsection, a court may order the violator to:

(i) remove or render harmless the litter disposed of in violation of this section;

(ii) repair or restore any property damaged by, or pay damages for, the disposal of the litter in violation of this section;

(iii) perform public service relating to the removal of litter disposed of in violation of this section or to the restoration of an area polluted by litter disposed of in violation of this section; or

(iv) reimburse the State, county, municipal corporation, or bi-county unit for its costs incurred in removing the litter disposed of in violation of this section.

Crim. Law § 10-110.

Based on our review, there is nothing apparent in the statutes that suggests that the legislature intended to punish the offenses separately, albeit, at one point in its history, the littering statute included a limited anti-merger provision. In 1971, when the present Litter Control Law was enacted, Section 468(e)(3) of former Article 27 provided that if "the violation of a provision of Subsection (d) of this Act also constitutes a violation of another

28

Article of this Code which imposes a more severe punishment, then that punishment may also be imposed." *See* 1971 Md. Laws, ch. 106 (H.B. 28). Even assuming that this section in former Article 27 might have applied to a section in the Natural Resources Article, former Article 27 Section 468(e)(3) was deleted in 1993 and replaced with specific penalties to be imposed upon violators, which penalties remain in effect to this day. *See* 1993 Md. Laws, ch. 474 (SB 772); *see also* Crim. Law § 10-110 (f) (3).

The State argues that two sentences were appropriate in this case under the following reasoning

> By leaving the houseboats unattended over a nine-month period in violation of Nat. Res. § 8-725.1, Roes impeded "the development, use, and enjoyment of . . . the waters of Maryland." Nat. Res. § 8-702. When the houseboats began to break apart, however, Roes additionally "allowed the disposal" of the houseboats as debris strewn within the Choptank River. Crim. Law § 10-110(c)(2).

Faced with this argument that appellant was punished for two separate acts, we shall consider the record. *See Johnson v. State*, 228 Md. App. 27, 46-47 ("Courts have looked to the charging document, jury instructions, verdict sheet, and evidence introduced at trial to determine whether ambiguity existed") (citation omitted), *cert. denied*, 450 Md. 120 (2016). If there is ambiguity, it is resolved in favor of the defendant. During opening statement, the prosecutor explained the case as follows, "[t]hese boats are an eyesore and they are in a dangerous condition, that's what I believe you will hear today." More specifically:

> This case is about boats that were brought to the Choptank River in Caroline County, Maryland that are in disrepair. One boat is in worst [sic] condition then [sic] the other, and you're going to hear about how these boats were disposed of and abandoned. And the state of disrepair that they're in, in the

29

Choptank River. How long they've been there, and um, you will also hear about who occupied these boats.

After all the evidence was received, the court instructed the jury on the charges of abandoning a vessel as follows:

The charges, the defendant is charged with two counts of abandonment of a vessel, and two counts of littering or dumping material over fifty . . . over fifty pounds in the waterway. The law is that person may not abandon any vessel upon any waters of the State. The provision does not apply to a vessel wrecked through an act of God or negligence of a third party. And abandoned vessel means that a, means any vessel that has been found adrift or unattended in or upon the waters of the State. And is found to be in a condition of disrepair as to constitute a hazard, obstruction to the use of the waters of the State or presents a potential health or environmental hazard. A vessel means every description of water craft including an iceboat but not a sea plane. Excuse me, any water craft that is capable of being used as a means of transportation on water or ice. A vessel includes a motor, spars, sales [sic], and accessories of the vessel. Waters of the State means any water within the jurisdiction of the State.

The court then instructed on the charges of littering:

A person may not dispose, or cause or allow the disposal of litter on a public or private property unless the property is designated by the State or political subdivision for the disposal of litter and the person is authorized by proper public authority to use the property or the litter is placed in a litter receptacle, or container installed on the property. Public or private property means . . . means a body of water, or water course on the shores of the beach of the body of water or the water course. Litter means all rubbish, waste, matter, refuge, garbage, trash, debris, dead animals or other discarded material of any kind or description.

During closing, the State argued:

I want you to think about the waterways in Caroline County. And how important the waterways are to all of us, and that's not to be taken lightly. And when you have two boats over five hundred pounds, over forty-five feet in length just sitting there, sinking, deteriorating over many years, that's a problem. It is a problem that is criminal. It's a problem that the Defendant is responsible for. It's a problem that the Defendant has not fixed.

30

Asking the jury to look at the pictures in the record, the prosecutor stated that "these boats are clearly abandoned and they are material that have been disposed of purposely in the Choptank River at the Defendant's property." And, "I want you to really think about how those pictures qualifies as abandoned vessels that are being disposed of as litter in the water, in Caroline County." Thereafter, after defense counsel argued that one man's trash is another man's treasure, the State responded in rebuttal, "[h]is treasure is rubbish, his treasure is affecting the water in Caroline County and he doesn't want to take responsibility of it." The State concluded its rebuttal argument as follows:

> And when it comes to the statement that a boat cannot be littered or abandoned, that doesn't qualified as litter. A boat is made out of material and any material can be disposed of or be litter. Someone drives by your house, or drives by, or is in a boat in front of your house and they just throw trash on your property, it doesn't matter if they don't own that property. They have littered and abandoned that property on your property. They disposed of property on your property without permission, much like the Defendant has brought property here to Caroline County and disposed of it, in the waters of the Choptank River with no intention of getting these boats out of the water, and that's material.

We are persuaded that the jury was not asked to separate appellant's conduct but rather to consider the same conduct as abandonment and littering. Even if the prosecutor's opening and closing could be read consistently with the State's argument on appeal, our review reveals no such distinction was made in either the jury instructions or the charges. Accordingly, appellant's sentences for abandoning a vessel should be merged into his sentences for littering. *Miles v. State*, 349 Md. 215, 229 (1998) (when there is merger under

31

the rule of lenity, the offense carrying the lesser maximum penalty ordinarily merges into the offense carrying the greater maximum penalty).

**SENTENCES FOR ABANDONING A VESSEL VACATED. JUDGMENTS OTHERWISE AFFIRMED.**

**COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY CAROLINE COUNTY.**