*Nathan Joseph Johnson v. State of Maryland*, No. 109, September Term, 2018. Opinion by Nazarian, J.

**CRIMINAL LAW – INVOLUNTARY MANSLAUGHTER – GROSS NEGLIGENCE**

The evidence was not sufficient to support a finding of gross negligence, and thus a conviction for involuntary manslaughter, where the defendant who sold drugs to the victim was a peer and fellow drug user and where there was no evidence that the defendant knew or should have known the drugs to be unusually dangerous.

Circuit Court for Queen Anne's County
Case No. 17-CR-17-290

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 109

September Term, 2018

_____

NATHAN JOSEPH JOHNSON

v.

STATE OF MARYLAND

_____

Graeff,
Nazarian,
Zarnoch, Robert A.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: January 31, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Brandon Roe and Nathan Johnson were friends who shared a heroin addiction. On November 3, 2016, Mr. Johnson bought heroin that, it turned out, also contained fentanyl. The two split the purchase. Mr. Roe took his portion of the drugs, overdosed, and passed away.

Months after Mr. Roe died, Mr. Johnson was charged and convicted in the Circuit Court for Queen Anne's County of involuntary manslaughter, reckless endangerment, possession with intent to distribute heroin and fentanyl, and possession of heroin and fentanyl. He was sentenced to ten years of incarceration (all but seven suspended) for involuntary manslaughter and a consecutive twenty years (all but five suspended) for distribution. Citing the Court of Appeals's recent decision in *State v. Thomas*, 464 Md. 133 (2019), Mr. Johnson argues on appeal that the evidence was insufficient to support a finding that he acted with gross negligence and, therefore, to support his conviction for involuntary manslaughter. He also disputes his possession with intent to distribute charges on sufficiency of the evidence grounds. We reverse his conviction for involuntary manslaughter and affirm the judgment in all other respects.

## I. BACKGROUND

### A. The Events That Led To Mr. Roe's Death

On November 3, 2016, Brandon Roe was a hard-working young man who, on the surface, was in recovery for drug addiction. Mr. Roe also bought and used drugs without being discovered. He seemed to be doing well. He worked for his stepfather's business. He maintained a relationship with a successful young woman. And his mother, who watched him closely to make sure he stayed clean, thought he was on the right path.

Unfortunately, in the early hours of November 4th, 2016, Mr. Roe's mother found him in his room unresponsive, face-down on his bed. The medical examiner determined Mr. Roe's cause of death to be "Acrylfentanyl and Heroin Intoxication."

Mr. Roe had spent the day working. After going to his day job with his stepfather, he power-washed a deck with his mother, then went home around 5:00 p.m. Mr. Roe and Mr. Johnson started texting each other at around noon to discuss how they were going to get drugs:[1]

> [MR. JOHNSON]: [11:58 a.m.] Yo u getting anything today
>
> [MR. ROE]: [12:01 p.m.] Yea later
>
> [12:29 p.m.] You don't get off till 4?
>
> [MR. JOHNSON]: [12:44 p.m.] Yeah
>
> [MR. ROE]: [12:46 p.m.] Ight we'll just hit me up. I'm about to be off and I gottago finish that job and then I got a small job to do for kaseys mom today
>
> [MR. JOHNSON]: [12:57 p.m.] Oh I gotcha I was going to see if u want to go half on a half?
>
> [MR. ROE]: [12:58 p.m.] Yea I might be able to I gotta make the money first cause I owe JJ40
>
> [MR. JOHNSON]: [12:59 p.m.] Oh shit I gotcha
>
> [MR. ROE]: [12:59 p.m.] Yea but il have it all I gotta do is go do the jobs
>
> [3:23 p.m.] U comin over soon u get off
>
> [3:56 p.m.] Lat me know something yo
>
> [4:36 p.m.] Yo are u comin over or what lol
>
> [MR. JOHNSON]: [4:37 p.m.] I don't think so why what's up
>
> [MR. ROE]: [4:38 p.m.] Cause I was gonna wait for u but of you ain't comin then nevermind

---

[1] We have reproduced the text messages verbatim.

[MR. JOHNSON]: [4:47 p.m.] About to pick up a half for 50

[4:47 p.m.] From a guy at work

[MR. ROE]: [4:47 p.m.] Can u sell me some

[MR. JOHNSON]: [4:48 p.m.] Yeah later

[MR. ROE]: [4:49 p.m.] Ok

[MR. JOHNSON]: [4:50 p.m.] Okay cool

[MR. ROE]: [4:51 PM] Let me know when

[MR. JOHNSON]: [4:52 p.m.] Okay

[4:52 p.m.] Allison and I'll probably come over there to get dinner and I'll do it then

[MR. ROE]: [4:52 p.m.] Ok that's cool

At around 5:30 p.m., Mr. Roe's mother noticed that he wasn't in the house. She texted him to ask where he was, and he responded that he was outside talking to his friend, Mr. Johnson. However, Mr. Roe was texting another individual saved in his phone as "Josh D" about meeting, apparently to acquire drugs:

[MR. ROE]: [5:07 p.m.] How long u gonna be cause I gotta walk there so I don't want u to have to wait

[JOSH D]: [5:07 p.m.] Like 15-20 minutes gotta meet one person [at] [Royal Farms] in Queenstown then ill be to u

[MR. ROE]: [5:07 p.m.] Ok

[JOSH D]: [5:28 p.m.] Leaving [Royal Farms] now

[MR. ROE]: [5:29 p.m.] Ok I'm here

[JOSH D]: [5:37 p.m.] Turning on Perry corner

[MR. ROE]: [5:37 p.m.] Ok come all the way back u'll see me

[5:52 pm] That shit is all baknsoda yo that ain't fuckin cool

Mr. Roe came back home after this exchange. His mother checked his pupils, a common practice, and didn't notice anything unusual. The pair drove to Mr. Roe's girlfriend's house to replace some carpeting. At around 8:00 p.m., Mr. Roe received $50

for his work—the only cash he had on hand that day. Then Mr. Roe and his mom went back home and ate dinner.

Throughout this period, Mr. Roe and Mr. Johnson continued to text to arrange a drug sale:

> [MR. JOHNSON]: [6:19 p.m.] You never let me know what you want it so I can make it before I leave I'm not bringing it all
>
> [MR. ROE]: [6:22 p.m.] Make a 40 if I get it
>
> [MR. JOHNSON]: [6:24 p.m.] I don't understand that make up 40 if you get it
>
> > [7:07 p.m.] Just trying to find out if you wanted or not before I leave I'm not gonna bring it if you don't want it
> >
> > [7:08 p.m.] But I'll tell you what it's some
> >
> > [7:10 p.m.] ?
> >
> > [7:10 p.m.] That's one of the reasons why I'm coming over the bridge to
>
> [MR. ROE]: [7:17 p.m.] I want it but gotta get the money after the job forst
>
> [MR. JOHNSON]: [7:22 p.m.] Yeah but you're going to finish the job tonight right
>
> > [7:22 p.m.] Because I'm bout to leave my house to head over there how long you think you'll be
> >
> > [7:31 p.m.] Ok well I'm going to Annapolis to go get food. So when you're ready just hit me up and I'll wrap up what I'm doing then ride over there real quick
>
> [MR. ROE]: [7:43 p.m.] Cool
>
> > [7:49 p.m.] I'm done and ready
> >
> > [7:53 p.m.] I want the 40
> >
> > [8:04 p.m.] Let me know something soon yo
> >
> > [8:58 p.m.] So what's goin on when yal leave
>
> [MR. JOHNSON]: [8:58 p.m.] Just got done paying for my

4

food now I have to leave and head that way unless I have to drop Allison and Chloe [off] either way I'll be there within the next hour

When Mr. Johnson was wrapping up at the restaurant, Mr. Roe asked how they were going to explain the impromptu visit to Mr. Johnson's family:

[MR. ROE]: [9:00 p.m.] Okay that's fine. What we SUPPOSE to be doin lol

[MR. JOHNSON]: [9:03 p.m.] Nothing I got me Chloe and Allison with Man I'm running over there real quick

[9:03 p.m.] I told her it's money from the job u owe me I just can't stay long

[MR. ROE] [9:04 p.m.] I know that lol but I'm saying why she think u'r comin

[9:05 p.m.] I gotcha bro il see ya when u get here just txt me when u get on the bridge

[MR. JOHNSON]: [9:10 p.m.] Okay

[9:21 p.m.] Just got off the bay bridge

[MR. ROE]: [9:22 p.m.] Ok il meet you at the end of my lane

Mr. Roe's mother heard him leave the house at around 9:30 p.m. She again texted Mr. Roe to ask where he was, and he responded he was with Mr. Johnson. Mr. Roe came back inside at around 9:45 p.m. and his mom thought he looked normal. After a few hours watching television and winding down for the evening, she discovered Mr. Roe's body at around 12:30 a.m. He only had two five-dollar bills left in his wallet.

Mr. Johnson gave the police his own version of events from that day. According to Mr. Johnson, Mr. Roe texted first thing to ask if "he was good." Mr. Johnson said that he had a gram of marijuana and a THC-infused brownie worth $40. He also told police Mr. Roe owed him $40 from a side job power-washing a deck together. He told police that

5

he didn't bring the brownie with him that night to sell to Mr. Roe. He said he wanted to drop off a fishing pole and pick up the $40 from the side job. Mr. Roe then decided that he wanted to use the $40 to buy heroin from "JJ Moore" later that night. Mr. Johnson said he saw a text from JJ Moore on Mr. Roe's phone that said Moore was "ready to roll." Mr. Johnson, having given Mr. Roe the fishing pole and not received the $40, left the house. Mr. Johnson gave the police a written statement about how Mr. Roe was planning to meet JJ Moore to purchase "dope."

During argument, the State indicated that the police didn't investigate "Josh D" or "JJ Moore" because their interactions with Mr. Roe didn't fit the timeline. When the police inspected Mr. Roe's cell phone, it didn't have any text messages with JJ Moore saved. The police attempted to extract the actual messages between Mr. Roe and JJ Moore, but Mr. Roe's cell phone was incompatible with the extraction device. Mr. Roe's cell phone records showed that he texted JJ Moore seven times between 1:47 p.m. and 4:47 p.m.[2]

---

[2] Mr. Roe's texts with JJ Moore on November 3, 2016 all occurred between 1:47 and 4:47 that afternoon:

> 1:47 p.m.: Mr. Roe text to JJ Moore
> 1:51 p.m.: JJ Moore text to Mr. Roe
> 1:52 p.m.: Mr. Roe text to JJ Moore
> 1:52 p.m.: JJ Moore text to Mr. Roe
> 1:53 p.m.: Mr. Roe text to JJ Moore
> 3:39 p.m.: Mr. Roe text to JJ Moore
> 3:40 p.m.: JJ Moore text to Mr. Roe
> 3:40 p.m.: Mr. Roe text to JJ Moore
> 3:40 p.m.: JJ Moore text to Mr. Roe

There was no evidence that Mr. Roe texted JJ Moore on the evening that Mr. Roe died.

Mr. Johnson was arrested on June 2, 2017. Mr. Johnson was charged with (1) involuntary manslaughter, (2) reckless endangerment, (3) possession with intent to distribute heroin, (4) possession with intent to distribute acrylfentanyl, (5) possession of heroin, and (6) possession of acrylfentanyl.

### B.    Mr. Johnson's Trial

Trooper First Class Michael Buckius testified at the bench trial as the investigating officer and the State's expert witness on drug-related code words and jargon. Trooper Buckius indicated that "a half" refers to a half gram of drugs. Trooper Buckius believed that the text messages between Mr. Roe and Mr. Johnson described the sale of cocaine or heroin. He also testified that in his experience, the use of the fire emoji when describing drugs means that the drugs are "really good."

The trial court convicted Mr. Johnson of all charges. He appeals his convictions and sentences. We supply additional facts as needed below.

## II.    DISCUSSION

Mr. Johnson raises four questions on appeal that we rephrase.[3] *First*, did the trial

---

3:41 p.m.: Mr. Roe text to JJ Moore

4:46 p.m.: Mr. Roe text to JJ Moore

4:47 p.m.: JJ Moore text to Mr. Roe

[3] Mr. Johnson raised four Questions Presented:

> 1. Is the distribution of heroin and fentanyl to an individual who subsequently dies from a fatal overdose sufficient to support an involuntary manslaughter conviction under a theory of gross negligence?

court err when it found Mr. Johnson guilty of involuntary manslaughter? *Second*, did the court err when it found Mr. Johnson guilty of possession with intent to distribute heroin and acrylfentanyl? *Third*, did the trial court abuse its discretion when it admitted Mr. Johnson's text messages with Mr. Roe when the State couldn't obtain Mr. Roe's texts with JJ Moore? *Fourth*, did the trial court err when it sentenced Mr. Johnson for distribution and involuntary manslaughter separately?

Mr. Johnson elected to have a bench trial. When convictions result from a bench trial, we "review the case on both the law and the evidence." Md. Rule 8-131(c). We will not "set aside the judgment of the trial court on the evidence unless clearly erroneous, and

---

2. Is circumstantial evidence sufficient to support a conviction for distribution of a controlled substance where the buyer communicated with an had the opportunity to purchase from other potential sellers?

3. Did the lower court err in allowing the introduction of text messages from a cellphone when some of the text messages could not be considered because they had been deleted?

4. Did the lower court err in imposing separate sentences for distribution and involuntary manslaughter?

The State rephrased those Questions Presented as:

1. Was the evidence sufficient to support Johnson's conviction for distribution of a controlled dangerous substance?

2. Was the evidence sufficient to establish that Johnson acted with reckless disregard for human life when he distributed heroin that he described as "fire" to a known addict, and which was ultimately determined to be heroin laced with acrylfentanyl?

3. Did the circuit court act within its discretion in admitting a text message conversation been Johnson and the victim?

4. Did the circuit court properly sentence Johnson?

8

will give due regard to the opportunity of the trial court to judge the credibility of witnesses." *Id.* This provision of the Maryland Rules does not apply to evidentiary rulings, *Starke v. Starke*, 134 Md. App. 663, 668 (2000), nor to legal conclusions, *State v. Neger*, 427 Md. 582, 595 (2012) (*quoting Clancy v. King*, 405 Md. 541, 554 (2008)). "For legal conclusions, we conduct a non-deferential review." *Id.*

### A. The Evidence Was Insufficient To Support A Finding That Mr. Johnson Acted With Gross Negligence.

*First*, Mr. Johnson argues that no rational factfinder could have found beyond a reasonable doubt that he acted with gross negligence, the *mens rea* element for the crime of involuntary manslaughter. He contends that he wasn't a routine drug dealer, that Mr. Roe did not have a "special vulnerability" to the sale, and that he only sold Mr. Roe 0.4 grams of heroin. The State responds that the evidence was sufficient because Mr. Johnson knew generally that heroin is inherently dangerous, because he described the heroin using a fire emoji, and because he sold Mr. Roe heroin without knowing either the heroin's composition or what else Mr. Roe might have ingested that day. We agree with Mr. Johnson.

When reviewing a conviction for sufficiency of the evidence, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Spell v. State*, 239 Md. App. 495, 510 (2018) (*quoting Fuentes v. State*, 454 Md. 296, 307–08 (2017)) (emphasis added). "In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State." *Id.* It is not our role to retry the case. *Id.* "Because the fact-

9

finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith v. State*, 415 Md. 174, 185 (2010). "[T]he finder of fact has the 'ability to choose among differing inferences that might possibly be made from a factual situation . . . .'" *Id.* at 183 (*quoting State v. Smith*, 374 Md. 527, 534 (2003)).

"Involuntary manslaughter is the unintentional killing of a human being, irrespective of malice." *State v. Thomas*, 464 Md. 133, 152 (2019). "[A] conviction of manslaughter will not lie on a showing of simple negligence or misadventure or carelessness but must rather be predicated upon that degree of aggravated negligence which is termed 'gross' negligence." *State v. Albrecht*, 336 Md. 475, 499 (1994). The required *mens rea* is determined by "whether the accused's conduct, 'under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others . . . .'" *Id.* (*quoting Duren v. State*, 203 Md. 584, 590 (1954)). Accordingly, "the State must demonstrate wanton and reckless disregard for human life" and the risk must fall "somewhere between the unreasonable risk ordinary negligence and the very high degree of risk necessary for depraved-heart murder." *Thomas*, 464 Md. at 160–61.

In *Thomas*, the Court of Appeals addressed for the first time the standard for gross negligence involuntary manslaughter in the context of a heroin transaction resulting in a fatal overdose. *Thomas* held that to support a conviction for a gross negligence involuntary manslaughter from the sale of heroin, (1) the defendant must have known, or should have known under the reasonably prudent person standard, that the underlying act of selling

10

heroin carried a severe risk of harm, and (2) the sale of heroin must be the actual and legal cause of the victim's death. *Id.* at 171, 173. The first half of the analysis itself has two components: the activity must be inherently dangerous *and* environmental risk factors must elevate that risk to rise to gross negligence.

This is a relatively new frontier for gross negligence law, and the Court of Appeals walked a delicate line in *Thomas*. On the one hand, the Court emphasized that "a *per se* rule providing that *all* heroin distribution resulting in death constitutes gross negligence involuntary manslaughter is unwise and not in keeping with our precedent." *Id.* (emphasis added). And although heroin distribution is inherently dangerous, the Court noted that "distribution, alone, does not *always* amount to gross negligence." *Id.* at 169. On the other hand, the Court quoted a 1990 Massachusetts decision stating that "the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous . . . ." *Id.* (*quoting Commonwealth v. Catalina*, 407 Mass. 779, 791 (1990)).[4] How, then, does the law distinguish a run-of-the-mill, or perhaps not-

---

[4] In *Catalina*, Massachusetts's highest court held the evidence was sufficient to support a defendant's indictment for involuntary manslaughter when the defendant knew the heroin he sold was particularly potent. 407 Mass. at 790. The Massachusetts court then described, as *Thomas* quoted above, the inherent risk of selling heroin. *Id.* at 790–91. But the issue in *Catalina* was a question of sufficiency of the evidence "to support the probable cause needed for an indictment, not whether the evidence was sufficient to support a conviction of involuntary manslaughter." *Commonwealth v. Carrillo*, 483 Mass. 269, 278 (2019).

Since then, the Massachusetts court noted that *Catalina* has been misconstrued as standing for the proposition that "the distribution of heroin alone is sufficient to support a guilty finding of involuntary manslaughter where the heroin causes the user's death." *Carrillo*, 483 Mass. at 281. The court recently rejected that proposition because it would create a *per se* rule, 483 Mass. at 281–82, and cited *Thomas* as consistent with that holding, *id.* at 285–87.

severely-risky, heroin transaction from one that does carry a severe risk of harm? *Thomas* identifies environmental risk factors that move a defendant's conduct along a "continuum of culpability" between non-criminal negligent conduct and criminal gross negligence, *id.* at 139, then takes a "holistic view of the risk factors at play" to determine whether the accused's conduct rose to the level of a "high risk to human life." *Id.* at 157, 166–67.

In applying these factors to the facts of this case, we note *first* that the State didn't offer any evidence on the inherent dangerousness of heroin at Mr. Johnson's trial. Nonetheless, *Thomas* held that the sale of heroin is an inherently dangerous activity, even if not gross negligence *per se*. *Id.* at 169 ("When some quantity of heroin will kill, but variable circumstances render that quantity unpredictable, a person takes a large risk in distributing any amount above an exceedingly de minimis threshold.").[5]

The primary risk factors identified in *Thomas* fell in two main groups: (1) the vulnerability of the buyer, or in the Court's language, his "desperation," and (2) the dealer's experience and knowledge:

> *Desperation/Vulnerability*
> - Mr. Thomas knew the decedent was a "young boy" who had been in prison in the past, and he believed him to be nineteen-years-old.
> - Mr. Thomas was fifty-eight years old.
> - The decedent called Mr. Thomas twenty-seven or twenty-eight times in less than a half hour period to purchase drugs.

---

[5] To be fair, when the trial court heard Mr. Johnson's case in November 2017 and sentenced Mr. Johnson in March 2018, it didn't have the benefit either of our decision in *Thomas*, which was reported later in 2018, or the Court of Appeals's decision, which issued in 2019.

- Mr. Thomas only answered one of those calls.

- Mr. Thomas and the decedent met at an unusual time, past midnight, when the pair usually met earlier.

*Id.* at 169.

*Dealer's Knowledge/Experience*

- Mr. Thomas was a "systematic and sustained heroin distributor" who "consistently distributed heroin to a substantial network of associates."

- Mr. Thomas was not an "infrequent or inexperienced provider."

- Mr. Thomas was a heroin abuser himself.

- Mr. Thomas purchased a high volume of heroin, fifty to sixty bags, in Delaware every two to three days.

- Mr. Thomas was in possession of 13.10 grams of heroin when he was arrested.

*Id.* at 170. Relying upon these facts, the Court held that Mr. Thomas's conduct rose to the

level of gross negligence:

> [W]e consider whether Thomas' conduct amounted to a "wanton and reckless disregard for human life,"—a gross departure from the conduct of an ordinarily prudent person, without regard to the consequences or the rights of others, and likely to bring harm at any moment. Thomas sold heroin to a desperate young man, knowing that the consumption of heroin could be deadly. He had extensive experience with heroin—distributing it widely, in a manner sure to net a profit, and with such frequency that he travelled across state lines two to three times a week to procure it—and was knowledgeable of its dangers. Yet, he either willfully failed to obtain the necessary information to help reduce the risks of his behavior, or he was indifferent to mitigating these risks. Either way, his conduct posed a high degree of risk to those with whom he interacted.

*Id.* at 171–72 (citations omitted). Even viewing the facts of this case in the light most

favorable to the State, though, Mr. Johnson's conduct lacks the risk factors that elevated

13

the dealer's conduct in *Thomas*:

*Desperation/Vulnerability*

- Mr. Roe and Mr. Johnson were very close in age—Mr. Roe was twenty-three when he died and Mr. Johnson was twenty-four.
- Mr. Roe and Mr. Johnson were friends.
- Mr. Roe texted Mr. Johnson twenty-six times between 11:58 a.m. and 9:22 p.m., nearly a nine-and-a-half-hour period.
- Mr. Johnson was engaging Mr. Roe in conversation during that period and the attempt at communication was not one-sided.

*Dealer's Knowledge/Experience*

- Mr. Johnson was not a "systematic and sustained heroin distributor."
- Nothing in the record suggests Mr. Johnson sold drugs at any other time.
- Mr. Johnson used heroin less than Mr. Roe.

Mr. Johnson was not in a position of power over Mr. Roe. The record reveals no reason for him to believe that Mr. Roe was at a heightened risk of harm, beyond the risk inherent in the act of buying and using heroin. Nothing in the record suggests their meeting was unusual or contains any signs that Mr. Roe was desperate. Instead, two friends split drugs after talking throughout the day about how they were going to acquire them.

Similarly, the record reveals no knowledge or experience as a drug dealer on the part of Mr. Johnson. The defendant in *Thomas* traveled to Delaware to purchase drugs in bulk two to three times a week and had many buyers. Here, the record reveals only one drug sale: the sale to Mr. Roe. Although, as an addict, Mr. Johnson obviously had

14

experience buying and using heroin beyond that sale, there was no evidence suggesting, let alone proving, that he was an active, higher volume drug dealer, or that he had any greater awareness of or opportunity to know the drugs' content than Mr. Roe did.

To be sure, the factors discussed in *Thomas* weren't meant to be exhaustive. As such, the State contends that Mr. Johnson "is correct that some of the risk factors present in *Thomas* are absent here," but argues that "other risk factors . . . take their place." We disagree.

The State argues primarily that Mr. Johnson knew that heroin had the potential to kill people, a fact that alone would be insufficient under *Thomas* to support the conviction because *Thomas* specifically rejected "a *per se* rule providing that *all* heroin distribution resulting in death constitutes gross negligence . . . ." 464 Md. at 167 (emphasis added). But in addition to the inherent risk argument, the State contends that Mr. Johnson's text message describing the heroin as "🔥" acknowledged a heightened level of risk in this particular sale:

> [MR. JOHNSON]: [6:19 p.m.] You never let me know what you want it so I can make it before I leave I'm not bringing it all
>
> [MR. ROE]: [6:22 p.m.] Make a 40 if I get it
>
> [MR. JOHNSON]: [6:24 p.m.] I don't understand that make up 40 if you get it
>
>> [7:07 p.m.] Just trying to find out if you wanted or not before I leave I'm not gonna bring it if you don't want it
>>
>> [7:08 p.m.] But I'll tell you what it's some 🔥
>>
>> [7:10 p.m.] ?
>>
>> [7:10 p.m.] That's one of the reasons why I'm coming

15

> over the bridge to
>
> [MR. ROE]: I want it but gotta get the money after the job forst

The State's expert in "drug related code words and jargon" testified that describing drugs as "fire" means the drugs are "really good." And the State argues the use of the fire emoji demonstrates Mr. Johnson's knowledge that the drug sale was so inherently dangerous as to show a wanton disregard for human life. But even the State's own expert's opinion wasn't quite so definitive:

> [THE STATE]: During your experience in the drug task force, have you heard or encountered the word fire as it relates to a controlled dangerous substance?
>
> [TROOPER BUCKIUS]: Yes.
>
> [THE STATE]: In what particular controlled dangerous substance?
>
> [TROOPER BUCKIUS]: I've heard it in marijuana and heroin.
>
> [THE STATE]: Okay. And what does it generally mean?
>
> [TROOPER BUCKIUS]: It means it's really good.

During argument, the State drew an inference from Trooper Buckius's description of the drugs and argued that "really good" means "really strong." But the trial court did not draw that inference. It stated that the "term fire, which the defendant used at one point, in and of itself, is *ambiguous*; [it] could mean marijuana, could mean heroin or could mean any other illicit drug, which is of especially *high quality* . . . ." (emphasis added). And the Trooper's testimony that the fire emoji meant the drugs are "really good" does not resolve that ambiguity. "Really good" could mean that the drugs have a particularly pleasant effect and that they're above average in quality, without meaning necessarily, as the State asserts, that the drugs were "really strong" or, more to the point, strong enough to demonstrate a

16

disregard for human life.

*Next*, the State asks us to consider that Mr. Johnson did not know of the drug's composition or origin. It's true that in *Thomas*, the Court mentioned that Mr. Thomas's lack of knowledge about the drugs' contents tended to show he was acting with reckless disregard in selling those drugs. But Mr. Thomas was a sustained, systematic drug dealer who made frequent bulk purchases. Those circumstances more naturally permitted an inference that the experienced drug dealer who didn't know the contents of the drugs he was dealing was acting recklessly.

By contrast, it would be unreasonable for us to interpolate an inference—which, again, lacked any concrete support in the record—that Mr. Johnson, an inexperienced dealer, would or should know the precise contents of the drugs he purchased and shared with Mr. Roe. Mr. Johnson sat at the lowest level of the dealer-user food chain, splitting a small purchase with a friend for their own use. Interpreting *Thomas* to assume knowledge of a drug's contents with its riskiness on the part all low-level, infrequent dealers would lead to the *per se* rule *Thomas* warned against.

Put another way, if this drug sale qualifies as grossly negligent, we struggle to imagine a transaction that wouldn't. Accordingly, we reverse Mr. Johnson's conviction for gross negligence involuntary manslaughter because, as a matter of law, no rational fact-finder could have found from the evidence presented to the trial court that he acted with gross negligence. And as a result, we don't reach the question of whether his sentences for involuntary manslaughter and distribution should merge.

17

**B.** **The Evidence Was Sufficient To Support Mr. Johnson's Conviction For Possession With Intent To Distribute Heroin and Fentanyl.**

*Next*, Mr. Johnson argues that the evidence was insufficient to support his convictions for possession with intent to distribute heroin and fentanyl because Mr. Roe had "multiple individuals [whom he] could have bought drugs from before his death."[6] The State responds that the trial court provided its reasoning for finding beyond a reasonable doubt that Mr. Johnson sold Mr. Roe the heroin that led to his death and that the evidence presented was legally sufficient. We agree with the State.

Mr. Johnson was charged and convicted under Maryland Code (2002, 2012 Repl. Vol.), § 5-602 of the Criminal Law Article ("CL"), which reads: "a person may not . . . possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance." In order to support a conviction for a possessory offense, the "evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited . . . drug in the sense contemplated by the statute, *i.e.*, that [the accused] exercised some restraining or directing influence over it." *Veney v. State*, 130 Md. App. 135, 143 (2000) (*quoting State v. Leach*, 296 Md. 591, 595–96

---

[6] Mr. Johnson raises the fact that the trial court relied only on circumstantial evidence. But "generally, proof of guilt based in whole or in part on circumstantial evidence is no different than proof of guilt based on direct eyewitness accounts." *Neal v. State*, 191 Md. App. 297, 314 (2010). "Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Hall v. State*, 119 Md. App. 377, 393 (1998).

(1983)). "The accused, in order to be found guilty, must know of both the presence and the general character or illicit nature of the substance. Of course, such knowledge can be proven by circumstantial evidence and by inferences drawn therefrom." *Id.* (*quoting Dawkins v. State*, 313 Md. 638, 651 (1988)). As with the involuntary manslaughter charge, sufficiency of the evidence to support these convictions turns on whether any rational trier of fact could have found the essential elements of the offenses. *Spell*, 239 Md. App. at 510.

Here, the trial court provided ample reason for finding that Mr. Johnson possessed the drugs that killed Mr. Roe. The court found that Mr. Johnson's version of events was unconvincing, that the State's expert was credible, and that the $40 discussed in Mr. Johnson's texts with Mr. Roe seemed consistent with the sale of heroin laced with fentanyl:

> The defendant, in my view, has been proven guilty beyond a reasonable doubt of all charges . . . . The defense has varied a little bit. The suggestion at the outset was that the only connection that the defendant had with this case was that he was coming over to innocently return a fishing pole and show his infant daughter to the defendant. Well, it's perfectly obvious to the Court and beyond all question that his actual intent was to do a drug transaction. His text messages make it abundantly clear and his statement to the police conceded that in large measure. The only possible defense the defendant could muster, under those circumstances, is that he was coming to sell marijuana, not heroin. But I don't buy it for a host of reasons.
>
> First of all, I believe that Officer Buckius was credible. . . . Some of the compelling testimony we have from Officer Buckius is that the other terms that the defendant used including a half, a 40, and other terms that are bandied about indicate that in the officer's opinion, the fire in this question is, to him, apparent and the Court believes that he's correct. The Court believes he's a credible witness and that the amount of money, the $40 in play here, was consistent with the 40 representing a portion of heroin laced with fentanyl and not

19

> marijuana because . . . had it been marijuana [the cost] would have been considerably greater than the amount of the street value that the officer placed on the heroin. . . .
>
> So I find the officer credible. I do not find the defendant credible. He did not testify, but to the extent his story was portrayed in the recorded interview, I found it primarily self-serving. It is significant that he had already been placed on notice that the family thought he was responsible for the death. He had motive and opportunity to try to create another suspect for the police, to get himself out of the hot seat and, in my view, that was what was motivating his decision to come in and give his story to the police.

The court went on to remark that the amount of money at play here was important in its decision. Mr. Roe undisputedly received $50 for work the day he died, and after he passed it was clear that $40 was missing. The court "believe[d] that the $40 that [Mr. Johnson] was referencing [in his text messages with Mr. Roe] is the same $40 that was missing [from Mr. Roe's wallet]" and stated that "circumstantially [the court was] persuaded beyond a reasonable doubt that [Mr. Johnson] received that $40." The trial court could infer readily from his text messages with Mr. Roe, his written statement to police, his police interview, and the medical examiner's report showing that Mr. Roe died of heroin and acrylfentanyl overdose that Mr. Johnson possessed the drugs.

The defense makes much about the fact that there could have been other opportunities for Mr. Roe to obtain drugs. But it is well within the realm of the fact finder to "choose among differing inferences," and we owe deference to those choices. *Neal*, 191 Md. App. at 317. A fact-finder's inference "need only be reasonable and possible; it need not be necessary or inescapable." *Smith*, 374 Md. at 539. Here, there is a potential conflict between inferences—as the State argues, Mr. Johnson's text messages with Mr. Roe about

20

selling a "40," followed by Mr. Johnson's subsequent visit to Mr. Roe's home on the day of Mr. Roe's death, permit an inference that Mr. Johnson sold Mr. Roe the drugs that killed him. Or maybe, as the defense argued at trial, Mr. Roe received the drugs from JJ Moore or the unidentified "Josh D." Ultimately, though, it was the trial court's role to choose between the competing inferences. We hold that the evidence before the trial court was sufficient to support its finding that Mr. Johnson was guilty beyond a reasonable doubt of possession with intent to distribute heroin and fentanyl.

### C. The Trial Court Did Not Err When It Admitted The Available Text Messages Between Mr. Roe and Mr. Johnson.

*Finally*, Mr. Johnson argues that the trial court erred when it admitted his text messages with Mr. Roe. Because the State was unable to extract Mr. Roe's full cell phone data, he argues that the text messages between Mr. Roe and JJ Moore may have been incomplete[7] and that his text messages with Mr. Roe should have been excluded both on fairness grounds and under the doctrine of completeness. We review the court's decision to admit this evidence for abuse of discretion. *State v. Simms*, 420 Md. 705, 724 (2011).

Maryland Rule 5-106 deals with writings or recorded statements and allows for an adverse party to require the introduction of the writing or statement:

> When part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

---

[7] Mr. Johnson gave the State permission to review his cell phone by signing a consent form and providing his password.

Here, the State introduced evidence of Mr. Johnson's text messages with Mr. Roe and Mr. Roe's text messages with Josh D. However, the police couldn't obtain copies of Mr. Roe's text messages with JJ Moore. It relied on phone records to establish that Mr. Roe communicated with JJ Moore in the afternoon on November 3rd, but not in the evening.

Mr. Johnson argues that "fairness necessitated the consideration of Roe's messages to Moore alongside his messages to Johnson." He argues that including his texts, which he gave to police himself, painted a misleading picture because Mr. Roe could have been talking to other people about drugs. But the trial court knew that Mr. Roe had talked to others about drugs. It was presented with Mr. Roe's phone records showing correspondence with JJ Moore, text messages about drugs between Mr. Roe and Josh D, and, of course, the text messages about drugs between Mr. Roe and Mr. Johnson.

The court was aware that the universe of text messages did not capture all of Mr. Roe's communications on the date of his death, and it had the ability to consider the messages it did have in the context of what it knew and in the context of Mr. Johnson's arguments about what messages were missing. We see no abuse of discretion in its decision to admit and consider Mr. Johnson's text messages with Mr. Roe, and to weigh them in considering these charges.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY FOR INVOLUNTARY MANSLAUGHTER COUNT REVERSED. JUDGMENTS AFFIRMED IN ALL OTHER RESPECTS. APPELLANT AND QUEEN ANNE'S COUNTY TO SPLIT COSTS.**