*Christina Granados McCauley v. State of Maryland*, No. 340, September Term, 2018. Opinion by Nazarian, J.

**CRIMINAL LAW – INVOLUNTARY MANSLAUGHTER – GROSS NEGLIGENCE**

The evidence was sufficient to support a finding of gross negligence where the defendant who sold drugs to the victim was an experienced drug dealer who knew the dangerousness of the drugs she sold.

**CRIMINAL LAW – RECKLESS ENDANGERMENT – MANUFACTURE, PRODUCTION, OR SALE OF A PRODUCT OR COMMODITY**

Carfentanil, a Schedule II controlled dangerous substance, is not a "product or commodity" as envisioned by the General Assembly when it enacted Maryland Code (2002, 2012 Repl. Vol.), § 3-204(c)(1)(ii) of the Criminal Law Article exempting the sale of a product or commodity from the crime of reckless endangerment.

Circuit Court for St. Mary's County
Case No. C-18-CR-17-000044

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 340

September Term, 2018

_____

CHRISTINA GRANADOS MCCAULEY

v.

STATE OF MARYLAND
_____

Nazarian,
Beachley,
Adkins, Sally D.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Nazarian, J.
_____

Filed: April 29, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Christina Granados McCauley was a drug dealer who knew the products she sold. On June 23, 2017, Ms. McCauley sold carfentanil to Joshua Wrightson and Mary Nell Miller. Mr. Wrightson and Ms. Miller both overdosed that night, and Ms. Miller died.

Ms. McCauley was charged and convicted by a jury in the Circuit Court for St. Mary's County of involuntary manslaughter, reckless endangerment, distribution of carfentanil, and possession of carfentanil. She was sentenced to ten years of incarceration (none suspended) for involuntary manslaughter, five years for reckless endangerment (merged into the involuntary manslaughter sentence), eight years for distribution of carfentanil (all suspended), and one year for possession of carfentanil (merged into the distribution sentence). Ms. McCauley argues on appeal[1] that the evidence was insufficient to support her conviction for involuntary manslaughter because the State failed to prove she had acted with gross negligence and there were superseding causes for Ms. Miller's death. She argues, relatedly, that the trial court erred when it denied her motion to dismiss the involuntary manslaughter and reckless endangerment charges. We affirm.

## I.  BACKGROUND

### A.  The Events That Led To Ms. Miller's Carfentanil Overdose and Death.

Joshua Wrightson and Ms. McCauley had known each other for two years before the night Mr. Wrightson's friend, Mary Nell Miller, died. Mr. Wrightson and Ms. McCauley met at a methadone clinic. Eventually, he became one of her buyers, and

---

[1] This Court stayed the appeal pending the Court of Appeals's decision in *State v. Thomas*, 464 Md. 133 (2019).

she would sell him what she said was a mixture of heroin and fentanyl.

On June 23, 2017, Mr. Wrightson was experiencing bad withdrawal symptoms and sought drugs to tide him over. He sent a message to Ms. McCauley through Facebook Messenger and told her that he "could use a break" from withdrawal. She wrote back that she wouldn't be home until 2:30 p.m., but that if he could find a ride to her place later, she had "a little" she would give him. At 5:16 p.m., Mr. Wrightson messaged Ms. McCauley and said that "Mary" was driving him over and they would be there in "45 minutes to an hour." Ms. McCauley testified that she didn't recall seeing the 5:16 p.m. message and that she didn't respond.

According to Mr. Wrightson, he and Mary Miller went to Ms. McCauley's house that day and they picked up what he believed to be "[s]ome of the heroin/Fentanyl." He said that Ms. Miller understood that the drugs were going to be "obtained for the both of" them and she knew what they "were going to obtain." After picking up the drugs, Mr. Wrightson and Ms. Miller drove back to the apartment Mr. Wrightson shared with Mark Bowers. Ms. McCauley disputes that any sale or transaction occurred. She testified that she didn't meet Mr. Wrightson on June 23 and that she didn't give Ms. Miller any drugs.

When Mr. Wrightson and Ms. Miller got back to Mr. Wrightson's apartment, the pair "went into [his] bedroom and put the powder on the chest of drawers." Immediately after "snorting some" of the drugs, Mr. Wrightson collapsed to the ground, hitting his head on the chest as he fell. Mr. Wrightson overdosed and passed out, rendering his remaining testimony on what happened that night unclear. He testified that he was unconscious for

2

"five hours." He then gave conflicting testimony: he said on direct that when he came to, he saw that "Mary was standing at the doorway to [his] bedroom," and then on cross-examination that when he awoke, Ms. Miller was dabbing his forehead. Regardless, some time after Mr. Wrightson awoke, he testified that he "called out for Mary" to ask where she was. When he didn't hear a response, he went to the bathroom door, knocked, and after not hearing a response, entered the room. He found her lying on the floor by the toilet, unconscious.

What happened next is unclear. Ultimately, Mr. Wrightson, his roommate Mark Bowers, and their neighbor John "Jack" Tangradi attempted to revive Ms. Miller. Mr. Bowers testified that he had been on an evening walk, and when he returned around 10 p.m., he witnessed "pandemonium" as Mr. Tangradi and Mr. Wrightson tried to resuscitate Ms. Miller. Mr. Bowers asked Mr. Wrightson how long Ms. Miller had been on the floor, and he responded ten minutes. Mr. Bowers, who at that time was sober, testified that he thought Ms. Miller had been on the floor "much more than ten minutes" because she was "starting to turn gray." Mr. Wrightson and Mr. Bowers administered Naloxone, but Ms. Miller didn't wake up. Mr. Bowers called 911, and medical personnel declared Ms. Miller dead at 10:56 p.m.

## B.     Ms. McCauley's Drug Transactions With Other Buyers.

The State presented evidence of Ms. McCauley's prior drug transactions. The testimony focused on Ms. McCauley's prior relationship with Mr. Wrightson, Mr. Tangradi, Melissa Boswell, and Sergeant William Heath, a Maryland State Police officer who bought drugs from Ms. McCauley twice while undercover.

3

*First*, Mr. Wrightson and Ms. McCauley had used fentanyl and overdosed together in 2017. Mr. Wrightson testified that he had overdosed from fentanyl that he had bought from Ms. McCauley four times. When he told Ms. McCauley about his overdoses, she told him "that's horrible," "be careful," "don't do too much," and "it's strong." *Next*, Mr. Tangradi, Mr. Wrightson and Mr. Bowers's neighbor, testified that he had bought heroin from Ms. McCauley before Ms. Miller died and that Ms. McCauley "said that it was not Fentanyl." He stated that he overdosed from those drugs "for about 12 hours."

Melissa Boswell testified about unrelated drug purchases she made from Ms. McCauley. She met Ms. McCauley at a methadone clinic a year before Ms. Miller died. On June 18, 2017, five days before Ms. Miller's death, Ms. Boswell sought drugs to use with her friends. She bought a mix of "pink Percosets" [*sic*] and what Ms. McCauley told her was fentanyl, but later was tested and found to be carfentanil. Ms. McCauley warned her to "be careful" and not do "too much." Then Ms. Boswell brought the drugs to her friends and echoed Ms. McCauley's warning that the drugs contained fentanyl and not to "take too much." Her friends took "a little scoop [of the drugs] out with a straw." After her friends didn't feel anything initially, Ms. Boswell gave them a bit more. Soon after, her two friends fell to the ground, "started seizing," and became unresponsive, and Ms. Boswell called 911. The friends were revived after several attempts. Ms. Boswell reached an agreement with the State to work with the police and testify at Ms. McCauley's trial.

*Finally*, Ms. Boswell testified that she coordinated with Sergeant William Heath to purchase drugs. On June 21, 2017, Sgt. Heath and Ms. Boswell drove to Ms. McCauley's

house to buy fentanyl. After Sgt. Heath, working undercover, was introduced to Ms. McCauley, she "immediately" told him "to be careful while using the [] Fentanyl, which she was about to provide." She warned that he should "just start with a little bit," "just a fucking flake," because the drugs were "that strong." She said, "please don't die," and gave him the drugs. Sgt. Heath testified that he believed she told him to use a "flake" of the fentanyl because the drugs were "so strong," and if he "were to use what she believed to be [his] normal amount, that would certainly lead to an overdose." Sgt. Heath and Ms. Boswell arranged one more buy on June 30, 2017, after Ms. Miller died. Sgt. Heath bought $30 worth of what he and Ms. McCauley agreed was fentanyl.

### C.    Expert Testimony at Trial

Amber Burns, the State's expert witness in forensic chemistry, testified that she tested the drugs Ms. McCauley sold to Ms. Boswell on June 18 that resulted in the overdose of two of Ms. Boswell's friends. Ms. Burns stated that she found "a net weight of 0.66 grams of Carfentanil," and that carfentanil is one of "45 known analogs" of fentanyl.

The State's Medical Examiner, Dr. Russell Alexander, testified about Ms. Miller. He stated that her cause of death was "Carfentanil intoxication." He also described the differences between fentanyl and carfentanil:

> Well Carfentanil and Fentanyl are both narcotics. Fentanyl is a very potent or very strong narcotic and Carfentanil is an even stronger or more potent narcotic. I've heard it estimated that Carfentanil is approximately 100 times more potent than Fentanyl, but the bottom line is Carfentanil is an analog or a variant of Fentanyl that is extremely potent.

He stated that "there are no approved uses for Carfentanil in [] humans in this country" and

5

that it's only approved for "veterinary purposes."

Ms. McCauley moved for acquittal, which the court denied. The jury convicted Ms. McCauley of all charges. She appeals. We supply additional facts as needed below.

## II. DISCUSSION

Ms. McCauley raises three questions on appeal that we rephrase.[2] *First*, was the evidence sufficient for a jury to find Ms. McCauley guilty of involuntary manslaughter? *Second*, did the trial court err when it denied Ms. McCauley's motion to dismiss the involuntary manslaughter charge? *Third*, did the court err when it denied Ms. McCauley's motion to dismiss the reckless endangerment charge?

### A. The Evidence Was Sufficient To Support A Finding That Ms. McCauley Acted With Gross Negligence.

*First*, Ms. McCauley argues that under the Court of Appeals's decision in *State v. Thomas*, 464 Md. 133 (2019), her sale of carfentanil to Mr. Wrightson and Ms. Miller does

---

[2] Ms. McCauley raised three Questions Presented:

> 1. Was the evidence sufficient to sustain Appellant's conviction for involuntary manslaughter?
>
> 2. Was it error to deny the motion to dismiss the charges of involuntary manslaughter?
>
> 3. Was it error to deny the motion to dismiss the charge of reckless endangerment?

The State rephrased those Questions Presented as:

> 1. Was the evidence sufficient to support McCauley's conviction for grossly negligent involuntary manslaughter?
>
> 2. Did the circuit court properly deny McCauley's motion to dismiss the charge of reckless endangerment?

not rise to the level of gross negligence involuntary manslaughter. *Second*, she argues further that *Ms. Miller*, not Ms. McCauley, "knowingly and recklessly play[ed] the narcotic version of Russian Roulette." *Finally*, she argues that Ms. Miller's life could have been saved by Mr. Wrightson, Mr. Bowers, and Mr. Tangradi, after she overdosed, and their failure to save her life was a superseding cause that interrupted the causal connection between Ms. McCauley's drug sale and Ms. Miller's death. The State responds that "there was substantial evidence that Ms. McCauley was aware of the extraordinarily dangerous nature of the substance she was distributing" and that the evidence was sufficient to find her guilty. The State is correct.

When reviewing the sufficiency of the evidence to support a conviction, we ask "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Roes v. State*, 236 Md. App. 569, 582 (2018) (*quoting Grimm v. State*, 447 Md. 482, 494–95 (2016)) (emphasis added). We don't have to believe that the evidence establishes guilt beyond a reasonable doubt—we determine instead whether there was enough evidence for a jury to come to that conclusion. The jury, as the trier of fact, weighs the evidence, and we don't question its conclusions "where there are competing rational inferences available." *Roes*, 236 Md. App. at 583 (*quoting Smith v. State*, 415 Md. 174, 183 (2010)). Accordingly, for sufficiency of the evidence, we review "(1) the 'essential elements' of the crime; and, (2) whether the State has met its burden of production." *Id.*

The elements of involuntary manslaughter were met. *State v. Thomas*, 464 Md. 133 (2019), is the seminal Maryland case on the standard for gross negligence involuntary

manslaughter resulting from a fatal heroin overdose. This Court applied *Thomas* for the first time in *Johnson v. State*, 245 Md. App. 46, No. 109, Sept. Term 2018 (filed Jan. 31, 2020). *Thomas* held that to support a conviction for gross negligence involuntary manslaughter from the sale of heroin,

> (1) the defendant must have known, or should have known under the reasonably prudent person standard, that the underlying act of selling heroin carried a severe risk of harm, and (2) the sale of heroin must be the actual and legal cause of the victim's death. *Id.* at 171, 173. The first half of the analysis itself has two components: the activity must be inherently dangerous *and* environmental risk factors must elevate that risk to rise to gross negligence.

*Johnson*, 245 Md. App. at 57-58 (citing *Thomas*, 464 Md. at 171, 173). The Court of Appeals's analysis in *Thomas* began from the premise that selling heroin is inherently dangerous. *Thomas*, 464 Md. at 169. But selling heroin is not enough in itself to support a finding of gross negligence involuntary manslaughter, and the Court of Appeals declined to recognize "a *per se* rule providing that all heroin distribution resulting in death constitutes gross negligence . . . ." *Id.* at 167, 169 ("[D]istribution, alone, does not *always* amount to gross negligence."). Instead, *Thomas* weighed "the inherent dangerousness of the act *and* environmental risk factors" to decide whether the sale amounts to a "high degree of risk to human life." *Id.* at 161 (emphasis added).

The evidence adduced at trial in this case included environmental risk factors that a reasonable jury could find had raised the baseline risk from a mere drug sale to a grossly

negligent sale.[3] The environmental risk factors discussed in *Thomas* fell into two groups: the vulnerability of the buyer and the dealer's experience and knowledge. *Johnson*, 245 Md. App. at 59-60. But the risk factors discussed in *Thomas* were not intended to be all-inclusive—environmental risk factors have to be assessed case-by-case and in context. *Thomas*, 464 Md. at 167; *Johnson*, 245 Md.App. at 62-63.

In this case, Ms. McCauley's knowledge and experience as a dealer increased the risk of the sale substantially. And her knowledge of the high level of danger was sufficient for a jury to elevate to a finding of gross negligence.

*Dealer's Knowledge/Experience*:

- Ms. McCauley sold Mr. Wrightson what she said was a mixture of heroin and fentanyl;

- On June 23, 2017, she knew that Mr. Wrightson and Ms. Miller were traveling together to pick up what Mr. Wrightson called "[s]ome of the heroin/Fentanyl" from Ms. McCauley's home;

- In 2017, Ms. McCauley and Mr. Wrightson had overdosed from fentanyl together;

- She was a routine dealer, selling to at least five individuals: Ms. Miller, Mr. Wrightson, Ms. Boswell, Sgt. Heath, and Mr. Tangradi;

- She knew that Mr. Wrightson had overdosed four times from fentanyl she sold him and, when told, she said, "that's horrible," "be careful," "don't do too much," and "it's strong";

- On June 18, she sold Ms. Boswell carfentanil, but told her it was fentanyl, and warned her to "be careful" and "don't do too much";

- On June 21, 2017, when she sold Sgt. Heath fentanyl,

---

[3] We are not asked, and therefore don't address, whether the sale of carfentanil alone, as opposed to the sale of heroin, constitutes gross negligence.

she "immediately" cautioned him "to be careful" and to start with "just a fucking flake" of the fentanyl because it was "that strong." She also told him, "please don't die."

- On June 30, 2017, Ms. McCauley sold Sgt. Heath what she acknowledged to be fentanyl.

The record in this case demonstrated that Ms. McCauley knew that the drugs she sold had caused multiple people, including herself, to overdose. She knew the actual and highly dangerous contents of the drugs she sold. In the past, she knowingly sold heroin containing fentanyl, a dangerous analog of heroin, and knew or should have known that she sold drugs containing carfentanil, a tranquilizer significantly more potent than Fentanyl used to sedate rhinos and other large animals. She knew the drugs she sold were so dangerous that she warned many of her buyers of their potency. Ms. McCauley's knowledge of the extreme dangerousness of the drugs she sold raised the risk level from her transaction with Ms. Miller to one in which a jury could find a reckless, wanton disregard for human life.

Comparing Ms. McCauley's knowledge to that of the defendant in *Johnson v. State* places this case in stark relief. Mr. Johnson was not a "systematic and sustained heroin distributor." *Johnson*, 245 Md. App. at 62. The State in that case presented evidence that he sold drugs once—and that one sale led to the death of Brandon Roe. *Id.* And perhaps because he wasn't a routine dealer, there was no evidence that he knew the particular contents of the drugs he shared with Mr. Roe. *Id.* On the other hand, Ms. McCauley knew, at the very least, that the drugs she was selling contained fentanyl. She knew how dangerous the drugs were, warning people to be careful and not to die. Where Mr. Johnson

10

lacked knowledge as a dealer, Ms. McCauley had it.

With the first element of the gross negligence involuntary manslaughter standard met, we turn *next* to whether Ms. McCauley's sale of carfentanil to Mr. Wrightson and Ms. Miller was the actual and legal cause of Ms. Miller's death. *First*, actual cause, or cause-in-fact, "concerns the threshold inquiry of 'whether defendant's conduct actually produced an injury.'" *Pittway Corp. v. Collins*, 409 Md. 218, 244 (2009) (*quoting Peterson v. Underwood*, 258 Md. 9, 16–17 (1970)). There is no dispute here that Ms. McCauley's sale of carfentanil to Ms. Miller led directly to her death—but for the sale of the lethal drugs and Ms. Miller's ingestion of them, she would not have died.

*Second*, legal cause "requires us to consider whether the actual harm to a[n individual] falls within a general field of danger that the actor should have anticipated or expected." *Id.* at 243. "The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Id.* at 246. Here, it was foreseeable that Ms. McCauley's sale of carfentanil to Mr. Wrightson and Ms. Miller could cause one or both to overdose and potentially die. At trial, the medical examiner testified that carfentanil is "approximately 100 times more potent than Fentanyl," itself "a very potent" narcotic. And Ms. McCauley knew of the danger because, again, she warned her buyers "it's strong," "be careful," "don't do too much," and "please don't die." The jury readily could have found it foreseeable that Ms. McCauley's sale of such a dangerous narcotic, which has "no approved uses . . . in humans in this country," could have caused Ms. Miller's death.

Ms. McCauley argues *next* that Ms. Miller's decision to use such a dangerous drug,

11

along with the failure of Mr. Wrightson, Mr. Tangradi, and Mr. Bowers to save her life after she overdosed, served as intervening and superseding causes to her death, breaking the chain of causation from Ms. McCauley's initial drug sale. We are unconvinced.

An intervening cause is not enough to avoid liability; the act must rise to the level of a superseding cause. *Pittway Corp.*, 409 Md. at 248. "[A] superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Id.* at 249. There were no such acts here. *First*, Ms. Miller's use of the drugs was not a superseding cause. It was entirely foreseeable when Mr. Wrightson and Ms. Miller drove together and met Ms. McCauley to buy drugs that she would use them. And shifting the "recklessness" analysis to Ms. Miller, as Ms. McCauley argues, is foreclosed by *Thomas*. 464 Md. 133 (2019).

*Second*, the fact that Mr. Wrightson, Mr. Bowers, and Mr. Tangradi failed to revive Ms. Miller after she overdosed is not a superseding cause either. "[T]here is no affirmative legal duty to rescue someone in peril. 'The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.'" *Fried v. Archer*, 139 Md. App. 229, 244 (2001) (*quoting Lamb v. Hopkins*, 303 Md. 236, 242 (1985)). And even putting aside the absence of a duty, Ms. McCauley could easily have anticipated their inability to resuscitate Ms. Miller. She herself has overdosed with another addict in the past, and she knew the risk of relying on someone else to intervene. Their failure to save her was neither unusual or extraordinary, and it was not a superseding cause. *See Pittway Corp.*, 409 Md. at 249. The evidence was

12

sufficient to support the jury's finding of actual and legal causation.

*Finally*, in reviewing the sufficiency of the evidence we ask whether the State has met its burden of production. *Roes*, 236 Md. App. at 583.

> In a criminal case, no issue is more important than whether the State has satisfied its burden of production. The concern is with production, as a matter of law, and not with persuasion, as a matter of fact. The appellate assessment of the burden of production is made by measuring the evidence that has been admitted into the trial objectively and then determining whether that body of evidence is legally sufficient to permit a verdict of guilty. In a jury trial, a motion for a judgment of acquittal at the end of the entire case initiates the examination of the satisfaction of the burden of production. If that burden of production is not satisfied, the trial judge is wrong, as a matter of law, for denying the motion and for allowing the case even to go to the jury.

*Chisum v. State*, 227 Md. App. 118, 130 (2016). And as explained more fully above, the State presented ample evidence regarding the sale and Ms. McCauley's knowledge of its dangerousness. A rational jury could conclude, based on the evidence presented in a light most favorable to the State, that Ms. McCauley was guilty of gross negligence involuntary manslaughter.

**B.** **The Trial Court Did Not Err When It Denied Ms. McCauley's Motion To Dismiss The Involuntary Manslaughter Charge Or The Reckless Endangerment Charge.**

*Next*, Ms. McCauley argues that the trial court erred when it denied her motions to dismiss the involuntary manslaughter and reckless endangerment charges. "Generally, the 'standard of review of the grant or denial of a motion to dismiss is whether the trial court was legally correct.'" *Blackstone v. Sharma*, 461 Md. 87, 110 (2018) (*quoting Davis v. Frostburg Facility Operations, LLC*, 457 Md 275, 284 (2018)). The resolution of this

question depends in part upon the interpretation of the statute defining reckless endangerment. We defer to the "policy decisions enacted into law by the General Assembly" and "assume that the legislature's intent is expressed in the statutory language." *Blackstone*, 461 Md. at 113. We start with the "plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Id.* (*quoting Schreyer v. Chaplain*, 416 Md. 94, 101 (2010)). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction." *Merchant v. State*, 448 Md. 75, 94 (2016) (*quoting Gardner v. State*, 420 Md. 1, 8 (2011)). Finally, we "consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Blackstone*, 461 Md. at 114.

### 1. Involuntary Manslaughter

Ms. McCauley argues *first* that the trial court erred when it denied her motion to dismiss the involuntary manslaughter charge because Maryland has not adopted a specific "statute creating a drug-induced homicide offense" and sound public health policy and good Samaritan legislation explain why. Ms. McCauley submitted her original brief containing this argument before *State v. Thomas* was decided by the Court of Appeals, but she didn't modify this argument when she filed a supplemental brief after *Thomas* came out.

*Thomas* answers directly the question of whether the State may bring an involuntary

manslaughter charge following a fatal overdose, and it resolves Ms. McCauley's policy arguments against her. The Court of Appeals now has recognized that a dealer can be criminally responsible for gross negligence involuntary manslaughter even though the legislature has not passed a statute criminalizing drug-induced manslaughter specifically. *See generally State v. Thomas*, 464 Md. 133 (2019).

### 2. Reckless Endangerment

*Next*, Ms. McCauley argues that the trial court erred when it refused to dismiss the reckless endangerment charge because under the plain language of the applicable statute, her conduct, *i.e.* the sale of illicit drugs, is exempted. Maryland Code (2002, 2012 Repl. Vol.), § 3-204 of the Criminal Law Article ("CR") outlines the crime of reckless endangerment:

> (a) *Prohibited.* – A person may not recklessly:
> (1) engage in conduct that creates a substantial risk of death or serious physical injury to another . . . .

Ms. McCauley argues that the sale of carfentanil is exempted from the reckless endangerment statute because it is a "product":

> (c) *Exceptions.* – (1) Subsection (a)(1) of this section does not apply to **conduct** involving: . . . (ii) the manufacture, production, or **sale of a product or commodity**.

CR § 3-204(c)(1)(ii) (emphasis added). The State responds that the exception in CR § 3-204(c)(1)(ii) does not apply to the sale of controlled dangerous substances. The State is correct.

The terms "product" and "commodity" are not defined in the Criminal Law Article. *Black's Law Dictionary* defines "product" as:

> Something that is distributed commercially for use or consumption that is [usually] (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption.

Product, *Black's Law Dictionary* (11th ed. 2019). "Commodity," on the other hand, is defined as:

> 1. An article of trade or commerce. The term embraces only tangible goods, such as products or merchandise, as distinguished from services. 2. An economic good, [especially] a raw material or an agricultural product.

Commodity, *Black's Law Dictionary* (11th ed. 2019). Under a plain meaning reading of the statute, CR § 3-204(c)(1)(ii) creates an exception to the crime of reckless endangerment when a person's "conduct" involves "the sale of a product or commodity." But Ms. McCauley argues that this statute creates a "broad 'exception'" and that the sale of carfentanil falls within it. We disagree.

Even under the plain meaning doctrine, we apply a reasonable interpretation compatible with common sense. *Merchant*, 448 Md. at 95. Carfentanil is a drug with no approved use in humans, and the sale of carfentanil is illegal. *See* CR §§ 5-101(g)(1), 5-403(c)(1)(v), 5-602. Accordingly, dealers engaged in selling carfentanil are not allowed to sell the purported "product" or "commodity," and the exception doesn't apply. It is inconceivable that the General Assembly enacted CR § 3-204(c)(1)(ii) to protect drug dealers engaged in the illicit sale of controlled dangerous substances. The trial court, after acknowledging the lack of case law on this point, came soundly to the same conclusion:

> As far as the issue about products and commodities and such like that under reckless endangerment, I didn't find any case

16

law on it. But in what I was reading and what I was understanding, I believe the purpose of that exception is that people who are doing legitimate and legal things, like a doctor who prescribes opioids but not excessively – that's a different story – a John Deere who make a tractor that could potentially be harmful to somebody if it's driven wrong or whatever, produces something else.

**That is to protect legitimate manufacturers, producers, sellers of products or commodities, in my opinion. And that this exception is not an exception for somebody that is dealing illegal drugs.** Illegal drugs that are known to be dangerous and that doesn't – it wouldn't be entitled to the protections of this exception under reckless endangerment.

So I think that that doesn't apply in this case at all. So I'm going to deny your motion to dismiss . . . .

We agree and find no error in the trial court's denial of Ms. McCauley's motion to dismiss

the reckless endangerment charge.

**JUDGMENTS OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**